JIFFY LUBE INTERNATIONAL, INC.,
Jiffy Lube International of Maryland,
Inc., Jiffy Lube Limited Partnership II,
and Heritage Merchandising Co., Inc.,
Plaintiffs,

v.

JIFFY LUBE OF PENNSYLVANIA, INC.,
Elph Automotive Services, Inc., Howard
G. Graeffe, and J. Peter Graeffe, Defen-
dants and Third–Party Plaintiffs,

v.

JIFFY LUBE OF TENNESSEE, INC.,
Pennzoil Company, and Pennzoil Prod-
ucts, Inc., Third Party Defendants.

Civ. A. No. 91–6818.

United States District Court,
E.D. Pennsylvania.

Jan. 10, 1994.

Howard D. Scher, Craig E. Ziegler, Montgomery, McCracken, Walker & Rhoads, Philadelphia, PA, for Jiffy Lube Intern., Inc., Jiffy Lube Intern. of Maryland, Inc., Jiffy Lube Ltd. Partnership, II, Heritage Merchandising Co., Inc.

Arthur L. Pressman, Joseph Schumacher, Craig R. Tractenberg, Abraham, Pressman & Bauer, P.C., Philadelphia, PA, for Jiffy Lube of Pennsylvania, Inc., Elph Automotive

Services, Inc., Howard G. Graeffe, J. Peter Graeefe.

Craig E. Ziegler, Montgomery, McCracken, Walker & Rhoads, Philadelphia, PA, for Jiffy Lube Intern. of Tennessee, Inc., Pennzoil Co., Pennzoil Products, Inc.

## DECISION AND ORDER

VAN ANTWERPEN, District Judge.

This case involves a protracted commercial dispute between plaintiffs Jiffy Lube International, Inc. and its related entities (hereinafter referred to collectively as "JLI"),[1] defendants and third-party plaintiffs Jiffy Lube of Pennsylvania, Inc. and its related persons and related entities (hereinafter referred to collectively as "Elph"), and third party defendants Jiffy Lube of Tennessee, Inc., Pennzoil Company and Pennzoil Products, Inc. (Pennzoil entities hereinafter referred to collectively as "Pennzoil"). On January 27, 1992, we granted plaintiff's motion for a preliminary injunction.[2] *See Jiffy Lube International, Inc. v. Jiffy Lube of Pennsylvania, Inc.,* 1992 WL 13682, 1992 U.S.Dist. LEXIS 788 (E.D.Pa. January 27, 1992). On April 14, 1992 we denied plaintiff's motion for a second hearing on a preliminary injunction. *See Jiffy Lube International, Inc. v. Jiffy Lube of Pennsylvania, Inc.,* 1992 WL 81568, 1992 U.S.Dist. LEXIS 5121 (E.D.Pa. April 14, 1992). We now consider plaintiffs' and third party defendants' (hereinafter referred to collectively as "Movants") motion for summary judgment on the counterclaim and third party complaint.[3]

## I. STANDARD OF REVIEW

■ Rule 56(c) of the Federal Rules of Civil Procedure provides for summary judgment where the:

§§ 1114, 1125(a), the Pennsylvania Trademark Act, 54 Pa.C.S. § 1101 et seq. and the common law of trademark infringement.

3. There are currently two motions pending for summary judgment. In addition to plaintiffs' and third party defendants' motion for summary judgment on the counterclaim and third party complaint, defendants and third party plaintiffs filed a motion for partial summary judgment on November 15, 1993.

1. Among the successors and affiliates and assigns of Jiffy Lube International, Inc. are the following Movants and plaintiffs: Jiffy Lube International of Maryland, Inc., Jiffy Lube Limited Partnership II, Heritage Merchandising Co., Inc., as well as third party defendant Jiffy Lube of Tennessee, Inc.

2. The preliminary injunction proceedings involved issues of trademark infringement and unfair competition, including JLI's contention that Elph was using JLI's trademark without authorization in violation of the Lanham Act, 15 U.S.C.

pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.

"The party moving for summary judgment must demonstrate that, under the undisputed facts, the non-movant has failed to introduce evidence supporting a necessary element of his case." *In re Phillips Petroleum Secur. Litigation,* 881 F.2d 1236, 1243 (3d Cir.1989). To defeat summary judgment, the non-moving party must respond with facts of record that contradict the facts identified by the movant and may not rest on mere denials. *Celotex Corp. v. Catrett,* 477 U.S. 317, 321 n. 3, 106 S.Ct. 2548, 2552 n. 3, 91 L.Ed.2d 265 (1986) (quoting Fed.R.Civ.P. 56(e)); *see also First Nat. Bank v. Lincoln Nat. Life Ins. Co.,* 824 F.2d 277, 282 (3d Cir.1987). The non-moving party must demonstrate the existence of evidence that would support a jury finding in its favor. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248–49, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986).

## II. FACTUAL BACKGROUND

In our January 27, 1992 opinion, we made extensive findings of fact involving the parties and the relationships among the parties. The following is a brief overview of the undisputed facts relevant to defendants' counterclaims and third party complaint.

On or about October 12, 1984, Howard Graeffe, Peter Graeffe, a former partner named Marvin Eglin, and Jiffy Lube International signed a Letter of Intent agreeing to form Jiffy Lube of Pennsylvania for the purpose of developing and operating Jiffy Lube service centers in the Lehigh Valley, Pennsylvania. Stock in Jiffy Lube of Pennsylvania was to be owned as follows: Peter Graeffe—25%; Howard Graeffe—25%; and Marvin Eglin—50%. On December 10, 1986, Howard and Peter Graeffe purchased all of Marvin Eglin's interest in Jiffy Lube of Pennsylvania.

On or about October 24, 1984, Jiffy Lube International and Jiffy Lube of Pennsylvania entered into an Area Development Agreement, in which Jiffy Lube of Pennsylvania agreed to develop a number of authorized Jiffy Lube service centers in the Greater Philadelphia market, including Berks, Lehigh, and Northampton counties and parts of Montgomery and Berks Counties.

Jiffy Lube of Pennsylvania entered into separate License Agreements with Jiffy Lube International for each Jiffy Lube service center Jiffy Lube of Pennsylvania developed. Pursuant to these License Agreements, Jiffy Lube International granted trademarks and service marks at these locations during the term of the License Agreement. Jiffy Lube of Pennsylvania agreed (a) to pay monthly royalty fees to Jiffy Lube International; (b) to make monthly contributions to a national advertising fund and/or a regional advertising cooperative association; (c) to make prompt payment for all products and supplies purchased from Jiffy Lube International or its related companies; (d) to submit periodically to Jiffy Lube International various financial statements, sales reports, and other statistical information; and (e) to maintain certain quality control standards in the operation of the authorized Jiffy Lube service center.

From Jiffy Lube of Pennsylvania's inception, Jiffy Lube of Pennsylvania and Jiffy Lube International entered into a number of loan agreements under which Jiffy Lube of Pennsylvania executed and delivered a series of promissory notes to Jiffy Lube International for royalty and licensing fees due under the terms of the License Agreements. Under the terms of these loan agreements, Jiffy Lube International agreed to credit Jiffy Lube of Pennsylvania the amount of certain fees, which would otherwise accrue, as a loan to fund development of the Jiffy Lube service centers.

By October, 1987, Jiffy Lube of Pennsylvania had developed and opened ten (10) Jiffy Lube service centers. These Jiffy Lube service centers were running at a deficit, and realizing that the loan-deferral arrangement described above was no longer sufficient, Jiffy Lube International and Jiffy Lube of Pennsylvania entered into an Asset Transfer Agreement, whereby Jiffy Lube International would acquire five (5) of the ten (10) operating Jiffy Lube service centers, togeth-

er with one-half the liabilities of Jiffy Lube of Pennsylvania and Jiffy Lube of Pennsylvania would operate the remaining five (5) Jiffy Lube service centers, assuming one half of the liabilities of Jiffy Lube of Pennsylvania.

Pursuant to the 1987 Asset Transfer Agreement, Jiffy Lube of Pennsylvania gave up its right to use the Jiffy Lube name in its corporate name. Accordingly, Elph Automotive was formed.

In August, 1990, Elph Automotive, Peter Graeffe, Howard Graeffe, and twelve (12) other Jiffy Lube franchisees and related entities filed suit against Jiffy Lube International, among others, in the Court of Common Pleas, Philadelphia County, captioned Brandywine Lubrication Services, Inc., et al. v. Jiffy Lube International, Inc., et al., August Term 1990, No. 5578.

In its Common Pleas action, Elph Automotive asserted that Jiffy Lube International and Jiffy Lube of Pennsylvania were at all relevant times joint venture partners, owing each other fiduciary duties, and that Jiffy Lube International lured Jiffy Lube of Pennsylvania into franchise agreements by fraudulently misrepresenting the profitability of existing Jiffy Lube franchises and by violating certain Federal Trade Commission rules. Accordingly, the Common Pleas Complaint sought rescission of the License Agreement, restitution for plaintiffs' investment and related expenses, and damages for Jiffy Lube International's alleged fraud and deceit.

In September or October, 1990, Jiffy Lube International made a blanket settlement offer to all plaintiffs in the Common Pleas action. With the exception of Elph Automotive and its related entities, all of the plaintiffs to the Common Pleas action settled their claims with Jiffy Lube International.

On November 1, 1991, after Jiffy Lube of Pennsylvania rejected Jiffy Lube International's omnibus offer, Jiffy Lube Interna-

tional filed the present action alleging claims for trademark infringement and unfair competition. On February 18, 1992, Elph filed its counterclaim and third party complaint. Many of Elph's claims in its counterclaims and third party complaint are similar to those in its state court action. On February 28, 1992, Elph voluntarily discontinued its state court action.

The crux of Elph's complaint involves Movants' allegedly fraudulent inducement of Elph to enter into a franchisor-franchisee relationship. Among its numerous allegations, Elph complains that JLI: misrepresented its financial condition and the financial condition of its other franchisees, failed to disclose an alleged scheme by Pennzoil to gain control of JLI, fraudulently induced Elph to undertake various loan agreements and contractual obligations with JLI, conspired with Pennzoil to tie Pennzoil products to the Jiffy Lube franchise system.[4]

## III. DISCUSSION

Movants seek summary judgment on four separate grounds: (A) that a release that Elph executed bars many, if not all, claims against Movants; (B) that no evidence exists to hold Pennzoil Company or Pennzoil Products Company liable as "alter-egos" of Jiffy Lube International, Inc.; (C) that there is a fatal failure of proof with respect to the RICO claims asserted in the counterclaim and third party complaint; and (D) that the statutes of limitations applicable to most, if not all, of the claims against Movants expired before Elph filed its counterclaim and third party complaint in this Court.

### A. The Release

■ On October 26, 1987, counterclaimants and third party plaintiffs Jiffy Lube of Pennsylvania, Howard Graeffe and J. Peter Graeffe entered into the aforementioned "Asset Transfer Agreement" with JLI.[5] The

---

**4.** Elph's First Amended Counterclaim and Third Party Complaint contains eleven separate counts: Count One—Breach of Contract; Count Two—Fraud and Intentional Misrepresentation; Count Three—Negligent Misrepresentation; Count Four—Breach of Fiduciary Duty; Count Five—Intentional Interference With Contractual Relationship; Count Six—Conspiracy; Count Sev-

en—Equity; Count Eight—Declaratory Judgment; Count Nine—Lender Liability; Count Ten—RICO; Count Eleven—Frustration of Contract.

**5.** For the purposes of the discussion of the release, our reference to "JLI" and "Movants" does not include third party defendants Pennzoil

Asset Transfer Agreement contains the following release:

> J.L. of PA for itself and its successors, assigns, and all other persons acting on its behalf or claiming under it and each of the Stockholders does fully and forever hereby release, remise, acquit, exonerate, and discharge JLI, its successors, assigns, affiliates, officers, directors, agents and/or employees of and from any and all actions, causes of actions, suits, claims, damages, expenses, debts, bills, covenants, contracts, controversies, agreements, promises, judgments, and demands of whatever kind or nature in law or in equity, against which J.L. of PA and each of the Stockholders may have ever had, now has or which any successors and assigns hereafter can, shall, or may have, upon or by reason of any manner, cause or thing whatsoever from the beginning of the world to the date of this Agreement.

Plaintiff's Exhibit "A", Asset Transfer Agreement at pages 10–11, ¶ 11(a). JLI claims that this release bars claims based on pre–1987 conduct against all plaintiffs and third party defendants (with the exception of the Pennzoil entities, the only non-signatories to the 1987 Asset Transfer Agreement).[6]

JLI further asserts that the entirety of Elph's claims are based on pre–1987 conduct. Its basis for this assertion is the following exchange, excerpted from the October 18, 1993 Deposition of J. Peter Graeffe:

> Q: Did you sustain any losses as a result of Jiffy Lube International breaching, as you contend, its obligations under the joint venture agreement after October 26, 1987?
>
> A: I believe that all of our losses since 1987 are a consequence of their breaches prior to 1987.
>
> Q: And when you say all of your losses, you mean the entirety of your claim; is that correct?

A: Yes.

Q: The $3 million-some-odd number that's articulated in your Answers to Interrogatories; is that correct?

A: I don't think it's—I'm not sure what you mean.

Q: Well—

A: I think it's—

Q: 7 million; right.

A: I think it was—I don't think that's the number either, but—

MR. SCHUMACHER: Mr. Scher has a piece of paper in front of him. If he wants to ask you questions about it—

BY MR. SCHER:

Q: We don't have to get to the detail of the numbers. All of your claimed losses that are claimed in your Answers to Interrogatories you attribute to Jiffy Lube International's breaches of the joint venture agreement?

A: I believe that's correct. I want to clarify only to say that I'm not sure that "breach" is—it was their conduct which may have been fraudulent. There may be other legal terms for that, but their behavior leading up to the—that agreement, yes.

Q: Their behavior, that is Jiffy Lube International's behavior, making representations, not disclosing information, and other conduct prior to October 26, 1987, did, in your view, result in the entirety of your claimed losses in the Answers to Interrogatories?

A: Yes.

Plaintiff's Exhibit "B," Deposition of J. Peter Graeffe taken October 18, 1993 at page 333, line 16 through page 335, line 9.

Before turning to the combined impact of the release and this deposition testimony, we must first conduct a choice of law analysis to determine the law applicable to Elph's contract and tort claims. In so doing, we dis-

---

Company or Pennzoil Products, Inc. These parties were not parties to the 1987 Asset Transfer Agreement, and the release has no direct impact on any of their potential liabilities.

**6.** We note that under both Maryland and Pennsylvania law, a general release to all mankind or all other persons bars further suit against other joint tortfeasors although they paid nothing for the release and were not expressly named therein. *Stefan v. Chrysler Corp.,* 472 F.Supp. 262 (D.Md.1979), *aff'd,* 622 F.2d 587 (4th Cir.1980); *Frank v. Volkswagenwerk, A.G. of West Germany,* 382 F.Supp. 1394 (E.D.Pa.1974), *aff'd in part, rev'd on other grounds,* 522 F.2d 321 (3rd Cir. 1975).

cuss the state law requirement of election of remedies and the significance of Elph's decision to affirm the 1987 Transfer Agreement. Finally, we analyze the legal effect of the release on Elph's various claims.

### 1. Choice of Law and Election of Remedies

■ The appropriate law to be applied in the interpretation and construction of the terms of the 1987 Transfer Agreement is a simple matter. The Agreement contains a choice of law provision, which reads: "This Agreement shall be construed, interpreted and enforced in accordance with the laws of the State of Maryland." Plaintiff's Exhibit "A", Asset Transfer Agreement at pages 10–11, ¶ 11(a). Both Elph and JLI agree that Maryland law governs the interpretation of the Asset Transfer Agreement, including the release in question.[7]

■ Contractual choice of law provisions, however, do not govern tort claims between contracting parties unless the fair import of the provision embraces all aspects of the legal relationship. Courts analyze choice of law provisions to "determine, based on their narrowness or breadth, whether the parties intended to encompass all elements of their association." *Composiflex, Inc. v. Advanced Cardiovascular Systems, Inc.*, 795 F.Supp. 151, 157 (W.D.Pa.1992); *See also Aamco Transmissions, Inc. v. Marino*, 1992 WL 38120, at *6 n. 15 (E.D.Pa.1992) ("narrow choice of law provisions are generally held insufficient to encompass the contracting parties' tort claims"); *Wright v. McDonald's Corp.*, 1993 WL 53582, at *7 n. 6 (E.D.Pa.1993). A careful reading of the choice of law provision at issue here demonstrates its restricted scope. The provision is limited on its face to "this agreement." As such, the Maryland choice of law provision only governs the construction, interpretation and enforcement of the 1987 Agreement. Elph's various tort claims of fraud and mis-

representation require a separate choice of law analysis.

■ Nevertheless, we do not face a true conflict of laws situation. The relevant area of substantive legal dispute involves the question of election of remedies. Under this doctrine, a party alleging fraud in connection with the formation of a contract has a choice: the party may either disaffirm the contract and tender back the consideration received, or affirm the voidable contract and waive the fraud. Elph urges that Pennsylvania law should apply to this question. *See* Elph's Response Brief, at 5. Movants originally claimed that Maryland law governs this question. *See* Movants' Brief, at 15. In their surreply brief, Movants do not specifically challenge Elph's choice of law analysis. Instead, Movants assert that Maryland and Pennsylvania law are essentially identical in the areas relevant to this case. In effect, Movants view the choice of law question as "immaterial" to the disposition of its motion. *See* Reply Brief in Further Support of the Motion of Plaintiffs and Third Party Defendants For Summary Judgment on the Counterclaim and Third Party Complaint, at 8 (hereinafter "Movants' Surreply"). We agree.

■ Under Maryland law, a party may not attack the validity of a given transaction that included the giving of a release unless the party seeks to set aside the transaction and to tender back the consideration received. *See Panamerican Consulting Co. v. Brown*, 238 Md. 438, 238 Md. 548, 209 A.2d 575, 581–82 (1965). Pennsylvania law requires the same election of remedies. As the Pennsylvania Supreme Court stated in *Nocito v. Lannuitti*, 402 Pa. 288, 167 A.2d 262 (1961):

If the procurement of this release was by fraud, when Nocito discovered it he had his choice either to disaffirm the contract and offer to return to Lannuitti or his insurance carrier the consideration for this re-

---

7. *See* Memorandum of Law in Support of the Motion of Plaintiffs and Third Party Defendants for Summary Judgment on the Counterclaim and Third Party Complaint, at 15 (hereinafter "Movants' Brief"); Defendants' and Third–Party Plain-

tiffs' Memorandum of Law in Opposition to Plaintiffs' and Third–Party Defendants' Motion for Summary Judgment, at 4 (hereinafter "Elph's Response Brief").

lease or to affirm the voidable contract and waive the fraud.

*Id.,* 402 Pa. at 290, 167 A.2d 262; *see also Hess v. Evans,* 288 Pa.Super. 180, 431 A.2d 347, 348 (1981) ("plaintiffs cannot proceed in this matter by alleging that the release was obtained as the result of fraud and misrepresentation and at the same time retain the consideration that was paid to them"); *Katz v. Aetna Casualty & Surety Co.,* 1993 WL 8749 at *2, 1993 U.S.Dist. LEXIS 203 at *6 (E.D.Pa.1993) ("equitable remedy of rescission and the legal remedy of damages are inconsistent and mutually exclusive").

Elph asserts that JLI fraudulently induced its entering into the 1987 Asset Transfer Agreement. Under the common law of both Maryland and Pennsylvania, Elph must choose between disaffirming the 1987 Asset Transfer Agreement and tendering back the consideration, or affirming the Agreement and waiving the fraud. Elph has expressly elected to affirm the 1987 Asset Transfer Agreement. *See* Plaintiff's Exhibit C, Defendants and Third Party Plaintiffs' Answers and Objections to First Requests for Admissions and Accompanying Interrogatories of Plaintiffs and Third Party Defendants, at 7. As a result of the choice, Elph has not tendered back the consideration received for the 1987 agreement. Consequently, Elph must now affirm the release and waive any claim of fraud with respect to the 1987 Transfer agreement. Since Maryland and Pennsylvania law are in accord in this respect, we need not reach the choice of law issue regarding Elph's tort claims.

## 2. Legal Effect of Release

 As previously stated, we employ Maryland law for the interpretation and construction of the release provision. Under Maryland law, releases are treated as contracts:

because releases are contracts, conventional rules of construction dictate that when the scope of the agreement is stated in clear and unambiguous language, the words utilized to express this breadth should be given their ordinary meaning as there is no room for interpretation.

*Bernstein v. Kapneck,* 290 Md. 452, 459, 430 A.2d 602, 606 (1981). Furthermore, the written language governs "the rights and liabilities of the parties, irrespective of the intent of the parties at the time they entered into the contract, unless the written language is not susceptible of a clear and definite understanding." *Pantazes v. Pantazes,* 77 Md. App. 712, 551 A.2d 916, 919 (1989).

 The release in question is broad in scope. It covers an unlimited variety of potential legal claims and extends in time back to the "beginning of the world." By its terms, we find that it clearly covers all of Elph's claims which arose prior to the signing of the 1987 agreement. In addition, the release covers claims Elph possessed contemporaneously with the signing of the 1987 agreement—the release bars claims that Elph "now has."

 Elph makes numerous arguments as to why the release should not bar its counterclaims and third party complaint. First, Elph claims that the release does not bar claims arising simultaneously with the execution and delivery of the Asset Transfer Agreement. The release, Elph continues, only bars claims which arose before the execution of the release. There are two answers to their argument. First, the release expressly covers claims which Elph "now has"—meaning claims which Elph had at the time of the execution of the release. Second, the doctrine of election of remedies bars their claim that the release was obtained fraudulently. If Elph chooses to affirm the contract, it cannot complain that it is the product of fraud.[8]

---

**8.** Elph cites *Katz v. Aetna Casualty & Surety Co., supra,* for the proposition that they have the option to "affirm the release and seek damages for the fraud." It is true that in dicta, the court in *Katz* described Pennsylvania's election of remedies law as permitting an action for damages for a fraudulently procured release. Nonetheless, the *Katz* court cites Pennsylvania cases that

make it perfectly obvious that a party who affirms a contract and refuses to tender back its consideration *waives the fraud* claim. Both *Hess v. Evans, supra* and *Nocito v. Lannuitti, supra* stand for this proposition. *See also Dempsey v. Associated Aviation Underwriters,* 141 F.R.D. 248 (E.D.Pa.1992), *aff'd,* 977 F.2d 567 (3d Cir.1992). We note that a recent Pennsylvania Superior

Elph next argues that the release is ambiguous as to its scope. In so doing, Elph makes reference to affidavits (prepared in connection with its memorandum in opposition to summary judgment) which describe Elph's subjective intent in signing the release.[9] Parol evidence regarding intent is admissible in interpreting ambiguous phrases in a contract. *See General Motors Acceptance Corporation v. Daniels*, 303 Md. 254, 492 A.2d 1306, 1310 (1985); *Bernstein v. Kapneck*, 430 A.2d at 607. However, the wording of this release has a clear and unambiguous meaning—it bars all claims of any legal nature. Consequently, we will not consider parol evidence concerning Elph's intent in signing the release. This release was negotiated by experienced business persons for valid consideration. Its meaning is perfectly ascertainable. We are bound by law to give it full effect.[10]

Elph next argues that the release merely bars claims based on JLI's conduct before the execution of the 1987 agreement, and that many of its claims are based on post–1987 conduct. Movants assert that J. Peter Graeffe's above cited deposition testimony unambiguously demonstrates that the entirety of Elph's claim in based on pre–1987

conduct. As a central participant in the various transactions leading to these lawsuits, Movants argue that J. Peter Graeffe in most intimately familiar with Elph's claims. We find Movants' argument convincing. Mr. Graeffe was asked repeatedly about the entirety of Elph's claim, and he consistently stated that all of the complained-of conduct occurred prior to the 1987 Asset Transfer Agreement.[11]

As evidence that some of Elph's claims arose after the date of the release (claims such as breach of contract, tortious interference, common law conspiracy, lender liability and frustration of contract), Elph cites the December 2, 1991 affidavits of J. Peter Graeffe and Howard G. Graeffe, prepared for the preliminary injunction proceedings. *See* Elph's Response Brief, at 12–13, n. 7. The referenced deposition testimony, however, merely describes in general fashion JLI's alleged breaches of contract and tortious behavior. Importantly, it includes *no dates* of the complained-of conduct.

Elsewhere, Elph cites further testimony by J. Peter Graeffe. Elph contends that this testimony reflects JLI's actionable post–1987

---

Court case has permitted a damage action for a fraudulently procured release. *Briggs v. Erie Ins. Group*, 406 Pa.Super. 560, 594 A.2d 761 (1991). Nonetheless, as a federal court sitting in diversity we are bound by existing Pennsylvania Supreme Court authority. As we have no authority suggesting that *Nocito v. Lannuitti, supra* and its progeny are no longer good law, we decline to overrule *Nocito* based on *Briggs. See Dempsey v. Associated Aviation Underwriters, supra,* at 250.

Elph separately argues that the onus is on JLI to show that the Graeffes had full and complete knowledge concerning the subject matter of the Asset Transfer Agreement. *See* Elph's Response, at 25–26. Elph cites Maryland authority which permits the setting aside of fraudulently obtained contracts. *See Parish v. Maryland and Virginia Milk Producers Association*, 250 Md. 24, 242 A.2d 512 (1968). In such a case, the party bearing a confidential relationship to the releasor must show the release was not obtained by fraud in order to avoid its rescission. Once again, however, Elph does not seek to set aside the Asset Transfer Agreement. Since Elph chooses to affirm the 1987 Asset Transfer agreement, there is no burden on JLI to demonstrate any knowledge on the part of the Graeffes.

9. The thrust of these affidavits is that Elph understood the release to prohibit Elph from de-

manding further consideration from JLI under the Asset Transfer agreement on account of liabilities of Jiffy Lube of Pennsylvania not disclosed to JLI as of the date of the Asset Transfer Agreement. *See* Elph's Response, at 10.

10. In its Reply Memorandum of Law in Further Opposition to Plaintiffs' and Third Party Defendants' Motion for Summary Judgment (hereinafter "Elph's Surreply Brief"), Elph attempts to distinguish *Nocito, Hess,* and *Panamerican Consulting* by stating that those cases involved releases which discharged claims which the plaintiffs were seeking to reassert. The release in this case, Elph asserts, doesn't have the effect of barring the legal actions asserted by Elph. We have already stated, however, that the release in this case is extremely broad in scope. It is certainly broad enough, by its terms, to bar claims for fraud, negligent misrepresentation, and breach of fiduciary duty which arose prior to the execution of the Asset Transfer Agreement.

11. There are four separate occasions when J. Peter Graeffe reiterates this position. *See* Plaintiff's Exhibit "B," Deposition of J. Peter Graeffe taken October 18, 1993 at page 333—lines 20 and 24, page 334—line 21, and page 335—line 9.

conduct. *See* Elph's Response Brief, at 16–24. However, a fair reading of this testimony demonstrates that it concerns J. Peter Graeffe's calculation of damages accruing after 1987. Since Elph released all claims arising before 1987, any damages which might have arisen after 1987 as a result of pre–1987 conduct are also released. *See Bernstein v. Kapneck*, 430 A.2d at 605 (clear and unambiguous release for consideration bars claims for unanticipated injuries which surface subsequent to the contract's execution).

Elph has failed to demonstrate any evidence that the conduct of which Elph is complaining occurred after the 1987 Asset Transfer Agreement. In the face of the compelling deposition testimony of J. Peter Graeffe presented by Movants, we find Elph's counterclaims are barred against all signatories of the release and their successors.[12]

## B. "Alter–Ego" Liability of Pennzoil

Pennzoil is the only non-signatory to the 1987 Asset Transfer Agreement. The release, therefore, does not absolve Pennzoil of liability in this matter. Nonetheless, many of Elph's claims are directed at Pennzoil as the "alter-ego" of JLI. We now address whether Elph has put forth "alter-ego" evidence sufficient to withstand Movants' motion for summary judgment.

As a preliminary matter, we must determine which of Elph's claims require a showing that Pennzoil is the alter-ego of JLI. Movants assert that all of Elph's claims, with the exception of its RICO claims, require as a prerequisite the showing of alter-ego liability. They point to the following paragraphs in Elph's First Amended Counterclaim and Third Party Complaint: ¶¶ 106, 114, 115, 117, 120, 122, 127, 128, 132, 133, 135, and 137. Movants argue that these paragraphs dem-

onstrate that Counts One through Six require a showing of alter-ego liability. Count Seven, Movants assert, does not seek relief from Pennzoil or Pennzoil Products. Count Seven seeks an injunction prohibiting JLI and its related entities from declaring Elph in default of any payment obligations to JLI and its related entities. Movants argue that nowhere in the Amended Counterclaim and Third Party Complaint is there any allegation that Elph has any payment obligations to Pennzoil or Pennzoil Products that could be declared in default. Counts Eight, Nine and Eleven do not specifically concern Pennzoil. Finally, Count Ten (RICO) is treated separately in Movants' brief.

Elph argues that Counts Five, Six and Seven do not necessitate a finding of alter-ego liability in order for Elph to recover against Pennzoil and Pennzoil Products.[13] *See* Elph's Response Brief, at 31. Instead, Elph asserts that it seeks relief from Pennzoil for wrongs committed by Pennzoil and Pennzoil Products themselves. While we agree with Movants that Counts Five, Six and Seven do make reference to Pennzoil's alleged scheme to influence or control the planning and operational decisions of JLI, we read these Counts as seeking to impose liability directly on Pennzoil for its individual actions. For example, ¶ 139 of Count Five alleges that Pennzoil "intentionally, improperly and unjustifiably induced or caused JLI to breach its agreements with Elph." And Count Six alleges that Pennzoil conspired with JLI to, among other things, "build the Jiffy Lube system for their own benefit and to the detriment of Elph." These claims for intentional interference with contractual relations and conspiracy do not require a finding of Pennzoil's alter-ego relationship with JLI in order to create liability for Pennzoil. Count Seven's equity claim similarly does not require a showing of alter-ego liability.[14] We

12. Those parties include plaintiffs Jiffy Lube International, Inc., Jiffy Lube International of Maryland, Inc., Jiffy Lube Limited Partnership II, and Heritage Merchandising Co., Inc., and third party defendant Jiffy Lube of Tennessee, Inc.

13. In Elph's Response Brief, Elph does not discuss Counts Eight, Nine and Eleven with respect to Pennzoil. We assume that Elph agrees that

Counts Eight, Nine and Eleven are inapplicable to Pennzoil, and as such, worthy of dismissal.

14. If, in fact, Elph has no payment obligations to Pennzoil or Pennzoil Products that could be declared in default, then this Count will obviously be moot as applied to Pennzoil. Based upon Movants' argument with respect to alter-ego liability, however, we will not dismiss Count Seven at this time.

will accept Elph's interpretation of its own counterclaim and third-party complaint as asserting direct liability against Pennzoil in these Counts. Thus, we analyze the sufficiency of proof with respect to Counts One through Four only.

■ Pennsylvania requires a very high showing of domination and control in order to establish "alter-ego" liability. To begin with, courts "start from the general rule that the corporate entity should be recognized and upheld, unless specific, unusual circumstances call for an exception." *First Realvest Inc. v. Avery Builders, Inc.*, 410 Pa.Super. 572, 600 A.2d 601, 604 (1991).

■ In order to recover, the party seeking to pierce the corporate veil on an alter-ego theory must establish "that the controlling corporation wholly ignored the separate status of the controlled corporation and so dominated and controlled its affairs that its separate existence was a mere sham." *Culbreth v. Amosa (Pty) Ltd.*, 898 F.2d 13, 14 (3d Cir.1990). Alternatively, it is necessary to show that "the controlled corporation acted robot- or puppet-like in mechanical response to the controller's tugs on its strings or pressure on its buttons." *Id.*, at 15. The relevant facts for piercing under an alter ego theory include:

> (a) insufficient capitalization; (b) intermingling of funds; (c) other officers and directors were not functioning; (d) failure to observe corporate formalities; (e) failure to pay dividends; (f) the fact that the corporation is a facade for the operations of the dominant shareholder. *Thompson v. Glenmede Trust Company*, 1993 WL 197031 at *11, 1993 U.S.Dist. LEXIS 7677 at *31 (E.D.Pa. June 8, 1993); *see also Village at Camelback v. Carr*, 371 Pa.Su-

per. 452, 538 A.2d 528, 535 (1988); *aff'd*, 524 Pa. 330, 572 A.2d 1 (1990).[15]

■ Elph presents five types of evidence which it claims demonstrates Pennzoil's alter-ego liability for the actions of JLI: (i) the participation of Pennzoil and Pennzoil Products employees on JLI's Board of Directors; (ii) Pennzoil's and Pennzoil Products participation in JLI's strategic planning; (iii) Pennzoil's and Pennzoil Products' rights over the common stock of JLI; (iv) JLI's dependency and reliance on Pennzoil's and Pennzoil Products' financial resources in connection with real estate development, acquisition of operating quick lube centers, and working capital loans to franchisees; and (v) agreements between Pennzoil, Pennzoil Products and JLI intended to control JLI's ability to negotiate alternative sources of funding.

While this evidence shows varying degrees of cooperation, coordination and even interdependence between Pennzoil and JLI, we find insufficient evidence of Pennzoil's domination and control of JLI to withstand summary judgment. We cannot say that JLI's existence constituted a mere sham. What's more, Elph has failed to demonstrate evidence of a single one of the *Thompson* factors listed above.

■ Each category of Elph's evidence lacks indicia of domination and control. First, Elph's evidence of Pennzoil employees on JLI's board of directors falls outside of the time periods relevant to Elph's claims. The first period of time during which Pennzoil and Pennzoil Products employees sat on JLI's board ended over a year and a half before Elph first had any contact with JLI in October, 1984. (*See* Exhibit "E" of Elph's Appendix; Exhibit "A" to Movants' Surreply Brief). The second period of time that Pennzoil employees sat on JLI's board, after Jan-

---

**15.** Elph cites *Ashley v. Ashley*, 482 Pa. 228, 393 A.2d 637, 641 (1978) for a purportedly less demanding alter-ego legal standard:

> This legal fiction of a separate corporate entity was designed to serve convenience and justice, and will be disregarded whenever justice or public policy demand and when the rights of innocent parties are not prejudiced nor the theory of the corporate entity rendered useless. We have said that whenever one in control of a corporation uses that control, or uses the corporate assets, to further his or her own person-

al interests, the fiction of the separate identity may properly be disregarded.

(citations omitted). It is worth noting that the court in *Ashley* found alter-ego liability where an individual owner of a corporation commingled personal interests with corporate interests. Elph does not allege that Pennzoil and JLI commingled corporate funds, the activity which warranted the *Ashley* court's "public policy" exception to the general rule that a shareholder is a legally separate entity from the corporation.

uary 8, 1990, began only after JLI's allegedly wrongful conduct towards Elph occurred.[16] Thus, Pennzoil representation on JLI's board of directors did not occur during the relevant period. Furthermore, even if the two corporations had shared some directors and officers, this alone is not evidence of alter-ego liability if corporate formalities continue to be observed. *Iron Worker's Savings and Loan Ass'n v. IWS, Inc.*, 424 Pa.Super. 255, 622 A.2d 367, 376 (1993).

██ Elph points to the fact that on January 8, 1990, Pennzoil acquired 80% of the common stock of JLI.[17] We have already found, however, that all of the damages Elph seeks to recover were allegedly suffered as a result of JLI's actions before October 26, 1987. Thus, Pennzoil's 1990 80% acquisition of JLI took place after the occurrence of JLI's allegedly wrongful behavior. In addition, without a showing of control, "subsidiaries, even if wholly-owned, are presumed separate and distinct entities from their parent corporations." *Clark v. Matsushita Electric Industrial Company*, 811 F.Supp. 1061, 1067 (M.D.Pa.1993).

Elph next presents evidence of alleged control of JLI's strategic planning. This evidence consists of the following: a letter from W.E. Welcher of Pennzoil Products to W.J. Hindman of JLI, in which Mr. Welcher offers comments on JLI's business plan in connection with a financing transaction that Pennzoil Products was negotiating with JLI; a letter from Arnold Janofsky of JLI to Paul Siegel of Pennzoil which led to Pennzoil's October, 1981 purchase of 10,000 shares of preferred stock of JLI;[18] and a letter from W.J. Hindman of JLI to William E. Welcher of Pennzoil in which JLI proposed a strategic business plan to Pennzoil to make Pennzoil JLI's preferred oil and lubrication supplier in 20 markets over five years.

This evidence does not rise to a level of domination or control of JLI's decision making. It merely suggests a degree of inter-firm cooperation that is consistent with a significant vendor-vendee relationship. Pennzoil, as a guarantor of a major JLI borrowing, was well within its rights to offer business advice to JLI. *See Krivo Industrial Supply Co. v. National Distillers and Chemical Corp.*, 483 F.2d 1098, 1105 (5th Cir.1973) (a creditor of a company is "largely interested in the prosperity of the company, and most naturally should desire to keep an oversight over its doings").

The remainder of Elph's evidence involves a number of contractual agreements between Pennzoil and JLI. As pointed out by Movants, Elph cites this evidence without explaining why these various agreements, negotiated at arm's length, result in a showing of domination and control. These contracts cover areas such as the creation of a limited partnership between JLI and Pennzoil and others to raise funds for the creation of new Jiffy Lube Service Centers, and Pennzoil's contribution to JLI's national advertising fund and discontinuance of its support of independent Pennzoil quick lube centers in exchange for designation of Pennzoil as the "oil of choice" in the Jiffy Lube system.

These many contractual relationships between JLI and Pennzoil are simply not probative of any day to day control of JLI's operating affairs by Pennzoil. *See e.g. Krivo Industrial Supply, supra*, at 1104–1105 (debtor-creditor relationship does not constitute control under an instrumentality theory). Elph has offered no evidence that corporate formalities were in any way disregarded or abused. Absent such evidence, Movants are entitled to summary judgment on Counts One through Four as against Pennzoil.

**C. RICO Claims**

Movants assert that there is a fatal failure of proof with respect to Elph's RICO claims

---

**16.** As discussed earlier, J. Peter Graeffe testified that all the damages Elph seeks to recover were allegedly suffered as a result of JLI's actions before October 26, 1987.

**17.** From the time Elph first became involved with JLI in October, 1984, until the stock purchase in January, 1990, neither Pennzoil nor Pennzoil Products owned any shares whatsoever of the stock of JLI.

**18.** Pennzoil sold this preferred stock in JLI, and gave up its right to place four representatives on JLI's board, in April, 1983, over a year and a half before Elph had any contact with JLI.

in Count Ten of Elph's First Amended Counterclaim and Third Party Complaint. Elph is proceeding under the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C.A. §§ 1962(a), 1962(b) and 1962(d). We treat these three sections separately.

### i. § 1962(a)

■ Section 1962(a) provides in pertinent part:

It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity or through collection of any unlawful debt in which such person has participated as a principal within the meaning of section 2, title 18, United States Code, to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

18 U.S.C. § 1962(a). As the Third Circuit has stated, this "provision was primarily directed at halting the investment of racketeering proceeds into legitimate businesses, including the practice of money laundering." *Brittingham v. Mobil Corp.*, 943 F.2d 297, 303 (3d Cir.1991).

■ Under this section, a plaintiff must demonstrate that the defendant: (1) received money from a pattern of racketeering activity; (2) invested that money in an enterprise;[19] (3) that the enterprise affected interstate commerce. *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1188 (3d Cir. 1993). "Furthermore, the plaintiff must allege an injury resulting from the investment of racketeering income distinct from an injury caused by the predicate acts themselves." *Id.* Section 1962(a) "is directed specifically at the use or investment of racketeering income, and requires that a plaintiff's injury be caused by the use or investment of income in the enterprise." *Brittingham, supra*, at 303.

■ Movants assert that Elph lacks any evidence of this latter requirement—that

Elph was injured by Movants' use or investment of racketeering income. In response, Elph quotes at length from the allegations contained in its responses to Movants' RICO interrogatories. *See* Elph's Response Brief at pages 64–68. Movants argue that this evidence is insufficient for two reasons: first, that Elph has failed to show how its injuries were the result of the use and investment of racketeering income, rather than injuries caused by the predicate acts themselves; second, that Elph's answers to interrogatories are not evidence, but merely allegations and theories.

■ We agree. Elph's recitation of its responses to Movants' RICO interrogatories fails to demonstrate any harm incurred by Elph as a result of the use and investment of racketeering income. For example, Elph's RICO response no. 55, quoted in Elph's Response Brief at page 68, supposedly provides the "factual basis of the violation of 18 U.S.C. § 1962(a)." The Response reads, in pertinent part:

... Had Pennzoil and Pennzoil Products not used the income derived from the pattern of racketeering activity to *financially prop up a nonviable JLI* with the intent of acquiring, through the wrongful acts articulated herein, the largest distribution channel for motor oil in the country at a cost per distribution center believed to be a fraction of the investment for similar distribution channels made by competitors, Elph and other Jiffy Lube franchisees would not have elected to purchase and pursue the development of these franchise business opportunities as JLI and its franchise business concept would have appeared on their face to any prudent investor to be financially unsound.

(emphasis added). However, the Third Circuit has repeatedly held that the "use and investment of racketeering income [which] keeps the defendant alive so that it may continue to injure plaintiff—is insufficient to meet the injury requirement of section 1962(a)." *Lightning Lube, supra* at 1188. In such situations, the plaintiff's injuries still

---

**19.** In its amended complaint and counterclaim, Elph has identified JLI as the RICO enterprise. *See* Exhibit "E," Amended Counterclaim and Third Party Complaint at page 42, ¶ 171.

stem from the pattern of racketeering, and not the investment of funds by the defendant. *See also Brittingham, supra,* at 304–305; *Glessner v. Kenny,* 952 F.2d 702, 708–710 (3d Cir.1991).

 In addition, Elph's citation to paragraphs in its Counterclaim (*See* Elph's Response Brief at 62) and lengthy quotations from their own answers to interrogatories fail to create genuine issues of material fact. The burden is on Elph to show evidence creating such a genuine issue. As Movants have stated, Elph has presented no deposition testimony, no documents, no party admissions to support its RICO claims. It relies instead on lengthy allegations and theories. A party may not rely on mere allegations or denials of his pleadings. Fed.R.Civ. Proc. 56(e). Elph must supplement the record in some way to support its allegations. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Tilden Financial Corp. v. Palo Tire Serv., Inc.,* 596 F.2d 604, 607 (3d Cir.1979). Elph is obligated to come forward with facts. *Childers v. Joseph,* 842 F.2d 689, 694–695 (3d Cir.1988). Elph has not done so here.

### ii. 1962(b)

Section 1962(b) provides that:

It shall be unlawful for any person through a pattern of racketeering activity or through collection of an unlawful debt to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

18 U.S.C.A. § 1962(b). In *Lightning Lube, supra,* the court held that "in order to recover under this section, a plaintiff must show injury from the defendant's acquisition or control of an interest in a RICO enterprise, in addition to injury from the predicate acts." *Lightning Lube, supra,* at 1190.

 In addition, "the plaintiff must establish that the interest or control of the RICO enterprise by the person is as a result of racketeering." *Lightning Lube, supra,* at 1190. Movants argue that Elph has no evi-

dence that Pennzoil or Pennzoil products obtained an interest in or control of Jiffy Lube International as a result of racketeering. For this latter proposition, Elph cites to its counterclaim and third party complaint. We agree with Movants that Elph's citation to its own Counterclaim is an insufficient presentation of evidence to withstand a motion for summary judgment. For the reasons stated in the discussion of § 1962(a) above, the burden is on Elph to present facts, and not merely allegations and theories.

In its Surreply Brief, Elph points to its RICO Responses Nos. 52 and 56 and Answers 1, 4, 5, 12, 13, 14, 17 and 30 of Elph's sworn Responses and Objections to Movants' First Set of Interrogatories to establish that Pennzoil and Pennzoil Product's interest in JLI was obtained through racketeering activity. After reviewing these documents, however, we fail to find evidence that Pennzoil's acquisition or control of JLI occurred as the result of racketeering. While we find allegations that Pennzoil and JLI conspired to injure Elph and other franchisees, and that Pennzoil's eventual control of JLI compounded Elph's alleged injuries, we do not find evidence that Pennzoil's alleged racketeering activity resulted in its control of JLI. *See Lightning Lube, supra,* at 1190 ("it must be established that there is a nexus between the interest and the alleged racketeering activities"). Absent such evidence, we grant summary judgment to Pennzoil on this count.

### iii. § 1962(d)

Section 1962(d) reads:

It shall be unlawful for any person to conspire to violate any of the provisions of subsections (a), (b), or (c) of this section.

The court in *Lightning Lube* held that "[a]ny claim under section 1962(d) based on a conspiracy to violate the other subsections of section 1962 necessarily must fail if the substantive claims are themselves deficient." *Lightning Lube, supra,* at 1191. As we have dismissed Elph's claims under §§ 1962(a) and 1962(b) for failure to establish genuine issues of material fact as to these claims, Elph's § 1962(d) claim must also be dismissed.[20]

---

**20.** We note that Elph does not dispute the legal

proposition that its § 1962(d) claim must fail if

## D. Statute of Limitations

 Movants present the defense that many of Elph's claims are barred by the applicable state statutes of limitations. Movants base their arguments on the fact that Elph filed its counterclaim and third party complaint on February 18, 1992, more than two years after J. Peter Graeffe allegedly became aware of Elph's claims against movants in September of 1989. Both Movants and Elph apparently accept the applicability of the so-called discovery rule—that the applicable statutes of limitations began to run when Elph first discovered its injuries.

For the proposition that J. Peter Graeffe became aware of Elph's claims against Movants in September of 1989, Movants cite the Deposition of J. Peter Graeffe taken October 19, 1993, Exhibit "B" to Movants' Motion for Summary Judgment, at page 621, line 18 through page 622, line 12. The relevant testimony reads:

> And the first time that I—that–I wouldn't say a light bulb going on, but the first time that I really thought the whole of it was—was—had been misrepresented to me, in a material way, for a very long period of time—and as I sit here now, if you ask me, when did I first think this or what was it that made me think that this was false, the thing that comes to mind was a detailed review over the telephone with Bob Falter on a year-by-year basis, a line-item-by-line-item basis of financial projections he had sent me sometime in September, I believe, of 1989, in which I went through and made notes in the margin and got to the final number, and I circled it and wrote

a big penciled "no," and I think that was the first time where I had the feeling that this kind of demographic analysis really was not going to result in—that it hadn't been a successful kind of analysis, that it wasn't done, it wasn't true.

Elph responds that this testimony is not decisive on the issue of when Elph became aware of its many claims against Movants. We agree. Movants fail to cite J. Peter Graeffe's words immediately before this cited text, in which he makes clear that he is recalling when he realized that the "site selection process" was flawed. Movants argue that the scope of this statement is broader than it reads, but we agree with Elph that there remain genuine issues of material fact as to when Elph discovered its claims against Movants.[21] Since we are unable to determine the dates of Elph's discovery of its injuries based on the evidence presented by Movants, we must deny summary judgment on those counts remaining against Pennzoil.

## IV. CONCLUSION

For the foregoing reasons, plaintiffs' and third party defendants' motion for summary judgment is granted with respect to all counts against Jiffy Lube International, Inc., Jiffy Lube International of Maryland Inc., Jiffy Lube Limited Partnership II, Heritage Merchandising Co., Inc., Jiffy Lube of Tennessee, Inc., and granted with respect to Counts One through Four, and Eight through Eleven against Pennzoil and Pennzoil Products; said motion is denied with

---

its § 1962(a) and § 1962(b) claims are legally deficient. *See* Elph's Response Brief, at 71.

21. We also disagree with Movants as to the significance of J. Peter Graeffe's Affidavit in Opposition to Plaintiffs' and Third Party Defendants' Motion for Summary Judgment. Movants allege that in his affidavit, J. Peter Graeffe admits that he discovered Elph's claims in November of 1989. In ¶ 16, J. Peter Graeffe states the following:

> Moreover, my rejection of JLI's loan proposal was based solely on my analysis of JL–Pa's ability to service the proposed debt load, and was not based on the discovery of claims or any other dispute with respect to JL–Pa's obligations to repay the loan.

In ¶ 17, J. Peter Graeffe states:

> It was our analysis of the proposed loan transaction, which analysis was not concluded until after November 1989, which led us to inquire as to the business rationale and assumptions underlying other projections and representations which had been made to us.

Read together, we do not read this affidavit testimony as stating that J. Peter Graeffe determined in November 1989 that he had certain claims against Movants. Rather, it states that this realization occurred at some unspecified time after November, 1989. Thus, there remain genuine issues of material fact as to when Elph discovered its claims against Movants.

585

respect to Counts Five through Seven against Pennzoil and Pennzoil Products.

An appropriate order follows.

## ORDER

AND NOW, this 7th day of January, 1994, consistent with the foregoing decision, it is hereby **ORDERED** that:

1. Plaintiffs' and Third Party Defendants' Motion for Summary Judgment on the Counterclaim and Third Party Complaint, filed November 15, 1993, is **GRANTED** with respect to all counts against Jiffy Lube International, Inc., Jiffy Lube International of Maryland Inc., Jiffy Lube Limited Partnership II, Heritage Merchandising Co., Inc., and Jiffy Lube of Tennessee, Inc.; and

2. Said Motion is **GRANTED** with respect to Counts One through Four, and Eight Through Eleven against Pennzoil Company, and Pennzoil Products, Inc.; and

3. Said Motion is **DENIED** with respect to Counts Five through Seven against Pennzoil Company, and Pennzoil Products, Inc.