NUBENCO ENTERPRISES,
INC., Plaintiff,

v.

INVERSIONES BARBERENA, S.A., Tecnologia Medica Internacional, S.A. and Alonso Lacayo B., Defendants.

Civil Action No. 96–26 (AJL).

United States District Court,
D. New Jersey.

March 25, 1997.

Louis H. Miron, Steven Morey Greenberg, Greenberg & Marmrostein, Hackensack, NJ, for Plaintiff.

David A. Mazie, Robert J. Lavitt, Nagel, Rice & Dreifus, Livingston, NJ, for Defendants.

LECHNER, District Judge.

This is an action brought by plaintiff Nubenco Enterprises, Inc. ("Nubenco") against defendants Inversiones Barberena S.A. ("Inversiones"), Technologia Medica Internacional S.A. ("Technologia") and Alonso Lacayo B. ("Lacayo") (collectively, the "Defendants"). Jurisdiction is alleged pursuant to 28 U.S.C. § 1441(a) and 28 U.S.C. § 1332(a).

Nubenco commenced this action by filing a five count complaint (the "1995 New Jersey Complaint") on 13 November 1995, in the Superior Court of New Jersey, Law Division, Bergen County (the "1995 New Jersey Action"). The 1995 New Jersey Action alleges, *inter alia*, breach of contract, tortious interference with contractual relations and defamation. Nubenco seeks compensatory and punitive damages, costs, interest and attorney's fees.

On 4 January 1996, the Defendants removed the 1995 New Jersey Action to this court. The Defendants submitted, pursuant to Rule 12N, Appendix N of the General Rules Governing the District of New Jersey ("Local Rule 12N"), a motion to dismiss, which will be construed as a motion for summary judgment (the "Motion for Summary Judgment").[1] For the reasons stated below,

---

1. In support of the Motion for Summary Judg- ment, the Defendants submitted: Notice of Mo-

the Motion for Summary Judgment is granted.

*Facts*

### A. *The Parties*

#### 1. *Nubenco*

Nubenco is a corporation organized under the laws of New Jersey, engaged in the business of supplying and distributing health, medical and pharmaceutical supplies and materials throughout the United States, South America and other parts of the world. Benzaken Certification, ¶ 1; *see also,* 1995 New Jersey Complaint, Count One, ¶ 1. Nubenco is authorized to transact business in the Republic of Nicaragua, maintains an agent in Nicaragua and has Nicaraguan counsel with power of attorney. Barberena Certification, ¶ 2. Andrew Benzaken ("Benzaken") was vice president of Nubenco at all relevant times. Benzaken Certification, ¶ 1.

#### 2. *Inversions*

Inversiones is a corporation organized under the laws of Nicaragua, with its principal place of business in Nicaragua. Barberena Certification, ¶ 2. At all relevant times Barberena was the president of Inversiones. *Id.,* ¶ 1.

#### 3. *Tecnologia*

Tecnologia is a corporation organized under the laws of Nicaragua, with its principal place of business in Nicaragua. *Id.,* ¶ 2.

#### 4. *Lacayo*

Lacayo is a citizen and resident of Nicaragua. *Id.* At all relevant times, Lacayo was president of Tecnologia and a vice president of Inversiones. *Id.*

### B. *Preliminary Negotiations*

In early 1992, Nubenco entered into negotiations with Inversiones and Tecnologia regarding the proposed sale of Nubenco's medical products to the Nicaraguan Ministry of Health (the "Ministry of Health"). Benzaken Certification, ¶ 2. Pursuant to such negotiations, Nubenco agreed to appoint Tecnologia as local agent for Nubenco, so that Tecnologia could respond to a request for bids issued by the Ministry of Health. *Id.,* ¶ 3. The parties verbally agreed on a brokerage commission (the "Verbal Brokerage Agreement"), which included, among other details, the amount of commission Barberena and Lacayo would receive on that bid. *Id.*

### C. *April Agreement*

In April 1992, Benzaken, in the capacity of Nubenco vice president, traveled to Nicaragua to finalize the Verbal Brokerage Agreement. *Id.,* ¶ 4. Upon arrival in Nicaragua, Benzaken found that the proposed contract

tion (the "Notice of Motion"); Defendants' Brief in Support (the "Defendants' Brief in Support"); Defendants' Reply Brief ("Defendants' Reply"); the Certification of Eduardo R. Barberena ("Barberena") (the "Barberena Certification"), with Exhibits A–C attached; the Unsworn Declaration of Robert G. Lavitt ("Lavitt Declaration"), with Exhibits A–B attached; proposed form of order.

In opposition to the Defendants' Motion for Summary Judgement, Nubenco submitted: Nubenco Brief in Opposition (the "Nubenco Brief in Opposition") and the Certification of Andrew Benzaken (the "Benzaken Certification").

On 2 January 1997, Nubenco was asked to clarify paragraph 16 of the Benzaken Certification. By letter, dated 6 January 1997, Nubenco responded ("6 January 1997 Nubenco Letter").

On 15 January 1997, the parties were asked to provide translated pleadings of other litigation proceedings between the parties. By letter, dated 27 January 1997 ("27 January 1997 Nubenco Letter"), Nubenco satisfied this request. On 25 February 1997, Nubenco forwarded an authenticated copy of Nubenco's pleadings in an action filed in 1994 in Nicaragua (the "1994 Nicaraguan Action")("Nubencols Translation"). By letter, dated 21 February 1997 ("21 February 1997 Defendants Letter"), the Defendants satisfied this request ("Defendants' Translation").

The cooperation of counsel in timely responding to requests for data in this matter is appreciated.

In addition, Nubenco filed several submissions regarding the status of the 1994 Nicaraguan Action. These submissions were filed following the deadline for submissions to this motion contrary to Local Rule 12N. These submissions were not considered in rendering the instant decision, but are noted where appropriate for completeness.

(the "Proposed Contract"), which was prepared by Barberena and intended to reflect the terms of the Verbal Brokerage Agreement, included terms to which Nubenco had not agreed. *Id.* Benzaken and Barberena then modified the Proposed Contract in their own handwriting. *Id.* On 6 April 1992, the parties executed the modified agreement in Nicaragua (the "April Agreement," attached as Exhibit A to the Benzaken Certification and Exhibit A to the Barberena Certification). Benzaken Certification, ¶ 4.

The April Agreement provides, in part:

In consideration of our mutual promises we have entered into the following contract whereby Nubenco ... does hereby promise to pay a brokerage fee or sales commission to [Inversiones] and [Tecnologia], whom (sic) will serve as an intermediary, brokers, representatives and agents, between Nubenco and all customers and client (sic) that Nubenco sell (sic) or could sell products to in Nicaragua; that said brokerage fee or commission is determined to be 10% of the value of the net order that could be awarded to Nubenco by the Ministry of Health in the Public Tender No. 01–92, which was prorogated (sic) by the Ministry to be open on April 8, 1992. Said commission and[/]or brokerage fee shall be determined, and paid without delay to [Inversiones] and [Tecnologia] in equal proportion upon payments received by [Nubenco] from the partial shipments and deliveries of materials in the place that [Inversiones] and [Tecnologia] indicates (sic)

[Inversiones] and [Tecnologia] does (sic) promise and agree to serve as intermediary and/or broker and/or representative and/or broker between Nubenco ... and [the Ministry of Health] in the referred bid.

Nubenco ... [Inversiones] and [Tecnologia] promise and agree that they will not in anyway whatsoever circumvent, or attempt to circumvent each other, or any of the other parties involved in any of the transaction(s) in Nicaragua; that they will not disclose any names, addresses, telephone or fax or telex numbers of any contacts, suppliers, etc., revealed by any of the parties to third parties, and that they recognize such contacts to be exclusive and valuable contacts of the respective party, and they will not enter into any agreement(s), negotiation(s), or transaction(s) with such contacts revealed by the other party, and that in the event of circumvention, either directly or indirectly, the circumvented party or parties shall be entitled to a legal monetary penalty equal to the maximum profit or fee or commission it could realize from such a transaction(s). This payment will also, additionally, include all legal expenses involved in the recovery of these funds. This agreement shall be binding on the parties hereto, their principals, employees, representatives, agents, assigns, consultants (sic), heirs and successors.

April Agreement (strike out text omitted).[2]

### D. *Nubenco-Ministry of Health Contract*

Nubenco was awarded the contract with the Ministry of Health (the "First Nubenco–Ministry of Health Contract"). Benzaken Certification, ¶ 6.[3] Inversiones and Tecnologia were paid their commissions, as provided pursuant to the April Agreement. Id.

### E. *August Agreement*

In mid–1992, the Ministry of Health announced it would consider bids for another proposed contract. *Id.*, ¶ 7. Following this announcement, Nubenco again negotiated with Barberena and Lacayo regarding a commission arrangement with Inversiones and Tecnologia. Id, On or about 7 August 1992, Nubenco, Inversiones, and Tecnologia entered into a second agreement (the "August Agreement", attached as Exhibit B to the Benzaken Certification and Exhibit B to the Barberena Certification), which established

---

**2.** There is a dispute among the parties as to whether the April Agreement governed only one request for bids by the Ministry of Health, *see* Benzaken Certification, 20, or constituted a "master agency contract," making the Defendants the exclusive agents for the sale of Nubenco products in Nicaragua, *see* Barberena Certification,¶ 3. This is not an issue of material fact which precludes summary judgment.

**3.** The record is silent as to the terms of the First Nubenco–Ministry of Health Contract.

the duties and responsibilities of each party. Id.

The August Agreement states:

Nubenco, hereby appoint (sic) [Inversiones] and [Tecnologia] jointly as exclusive agent (sic) and representative (sic) for product(s) to be offered under the [Ministry of Health] direct purchase request of August 1992, for the territory of Nicaragua.... Nubenco will have no other representative for this direct purchase program for the product amended to this agreement.

## I OBLIGATIONS OF [INVERSIONES/TECNOLOGIA]

Both [Inversiones] and [Tecnologia] jointly and severally bind themselves to: 1) present the offers made by Nubenco in the manner recommended by Nubenco and in accordance to the conditions sated (sic) in the request where possible[,] 2) to do their best to achieve the possible highest sale for this offer[,] 3) in case of claims or disputes [with the Ministry of Health] [Inversiones/Tecnologia] will attend in person or as required by [the Ministry of Health] to these matter (sic) immediately and give their full support to Nubenco to settle these claims or dispute[, and] 4) for product(s) offered by Nubenco and amended to this agreement an (sic) which form an integral part of this agreement [Inversiones and Tecnologia] agree to:

-represent no other company for this program of pharmaceuticals only[,]

-to sell for no other company for this program of pharmaceuticals only[, and]

-to purchase from no other company for this program of pharmaceuticals only.

## II OBLIGATIONS OF NUBENCO

1) Nubenco will make every effort to reply to inquiries in the shortest possible time in accordance to condition stated in (sic) request.

2) Nubenco will supply the most competitive and accurate pricing and information possible and sample (sic) and documentation as needed without charge.

3) Nubenco will support the sales effort (sic) of [Inversiones and Tecnologia] in every possible way including joint visits to the customers when possible.

4) unless otherwise agreed, Nubenco will offer only products that it believes it can secure a Free Sales Certificate.

5) Nubenco will take into consideration the advise (sic) and/or recommendation (sic) offered by [Inversiones and Tecnologia] on this program.

6) Nubenco will execute a power of attorney/representation to [Lacayo and Tecnologia] to use for presenting (sic) offer. This document will be notarized and legalized by the Nicaraguan Consulate.

## IV⁴ COMMISSIONS

1. 15% FOB value of awards resulting from participation in referenced project or sale (sic) to be paid by Nubenco to [Inversiones and Tecnologia] in equal proportion....

2. Nubenco will pay commission to [Inversiones and Tecnologia] promptly and without delay on receipt of payment from [the Ministry of Health] or its paying agent in the currency of payment at the account/location specified by [Inversiones and Tecnologia] in writing ...

## V DURATION OF AGREEMENT

1) This agreement is valid for the duration of this project related to the direct purchase and for the product(s) which form an integral part of this agreement.

2) Both parties expressly confirm that no compensation whatsoever may be claimed by either party in case the agreement is terminated at any time [by] both parties unanimously. Any commission due on such termination will remain due to [Inversiones and Tecnologia].

3) Both parties expressly confirm that after effected termination of this agency agreement, both sides are free to appoint/accept other agent/agencies/sellers/suppliers without any prejudice whatsoever.

## VII⁵ GOVERNING LAWS

---

4. It appears the August Agreement was misnumbered as there is no paragraph III.

5. This paragraph also appears to be misnumbered.

1. This agreement is governed by the laws of the State of New Jersey.

2. Any dispute arising from this agreement requiring the intervention of a court will be brought before a competent court of the State of New Jersey oer (sic) where the laws of New Jersey permit it.

3. If any clauses or provision (sic) of this agreement is (sic) found to be in violation or contradiction of existing statute(s), the remainder of this agreement remains in full force.

4. This contract can be amended only in writing and with the agreement of all the undersigned.

5. This agreement automatically expires on termination of this project and can otherwise be terminated only on the unanimous consent of all signatories unless [Inversiones and Tecnologia] are in disagreement at which time clause six directly below is operative.

6. Nubenco will be automatically relieved of any obligation under this contract should [Inversiones] and [Tecnologia] express disagreement among themselves in their ability to execute this contract. Such disagreement will be demonstrated by a letter sent by either party indicating such disagreement and apparent inability to resolve it. In this case Nubenco will serve in witting to each party a notice of termination of this contract with an effective period of no less than 30 days to allow the parties to resolve their differences.

August Agreement.

### F. Second Nubenco–Ministry of Health Contract

Nubenco was awarded a second contract with the Ministry of Health (the "Second Nubenco–Ministry of Health Contract").[6] Benzaken Certification, ¶ 11.

Nubenco asserts the Defendants did not satisfy their obligations under the August Agreement because they failed to secure the return of a bid guarantee bond. Id., ¶ 9. Nubenco claims it was forced to secure this bond through the assistance of other parties. Id.

After the award of the Second Nubenco–Ministry of Health Contract, Nubenco discussed the possibility of entering into another agreement with Inversiones and Tecnologia. Id., ¶ 12. The parties, however, were not able to reach an agreement concerning the material terms of such an agreement. Id. The parties did not enter into a third agreement. Id.

### G. Proceedings in Nicaragua

Inversiones and Tecnologia contend that, in 1993, Nubenco violated the April Agreement when Nubenco began soliciting and engaging in business with clients of Inversiones and Tecnologia while using another agent. Barberena Certification, ¶ 5. Inversiones and Tecnologia further contend that Nubenco failed to pay commissions owed them pursuant to the April Agreement. Id.

### 1. The 1994 Nicaraguan Complaint

In February 1994, Inversiones and Tecnologia filed a complaint in the 1994 Nicaraguan Action (the "1994 Nicaraguan Complaint") against Nubenco for breach of the April Agreement.[7] Barberena Certification, ¶ 5. Nubenco responded to the 1994 Nicaraguan Complaint and filed an answer (the "1994 Nubenco Nicaraguan Answer") and counterclaim (the "1994 Nubenco Nicaraguan Counterclaim"). Id.

It is contended that in 1995, Inversiones and Tecnologia arranged for the Nicaragua Ministry of Economy to place an embargo on Nubenco's products. Benzaken Certification, ¶ 13.

### 2. 1994 Motion for Summary Disposition

Inversiones and Tecnologia moved before the Nicaraguan trial court (the "Nicaraguan Trial Court") for summary disposition of the 1994 Nicaraguan Action (the "1994 Motion for Summary Disposition"). Barberena Cer-

---

6. The record is silent as to the terms of the Second Nubenco–Ministry of Health Contract.

7. Inversiones and Tecnologia contend the 1994 Nicaraguan Complaint and 1994 Nicaraguan Action both related exclusively to the April Agreement. Barberena Certification, ¶ 4.

tification, ¶ 6. In support of the 1994 Motion for Summary Disposition, Inversiones and Tecnologia argued (1) the 1994 Nubenco Nicaraguan Answer was untimely, (2) the 1994 Nubenco Nicaraguan Counterclaim was untimely and (3) the attorney who filed the 1994 Nubenco Nicaraguan Answer and 1994 Nubenco Nicaraguan Counterclaim did not hold the requisite power of attorney from Nubenco at the time such documents were filed. *Id.*

### a. *Trial Court*

The Nicaraguan Trial Court denied the 1994 Motion for Summary Disposition and permitted the 1994 Nubenco Nicaraguan Answer and 1994 Nubenco Nicaraguan Counterclaim to be filed out of time. *Id.*

### b. *Appellate Court*

Inversiones and Tecnologia appealed the decision of the Nicaraguan Trial Court which permitted the late 1994 Nubenco Nicaraguan Answer and 1994 Nubenco Nicaraguan Counterclaim. Id. In October 1995, a Nicaraguan Appellate Court (the "Nicaraguan Appellate Court") held that the 1994 Nubenco Nicaraguan Answer and 1994 Nubenco Nicaraguan Counterclaim were untimely and that the attorney who filed such documents for Nubenco did not hold the requisite power of attorney at the time of filing. *Id.* The Nicaraguan Appellate Court remanded the matter to the Nicaraguan Trial Court for disposition in conformity with the Nicaraguan Appellate Court decision.[8] *Id.*

### c. *Trial Court on Remand*

On remand, the Nicaraguan Trial Court held Nubenco to be in contempt of court. Benzaken Certification, ¶ 24. "The effect of

being regarded in contempt of court is that by Nicaraguan procedural rules, the claim of [Inversiones and Tecnologia] [against Nubenco] is regarded as being denied." Benzaken Certification, ¶ 24. Nubenco was then "able to convince the trial court to permit Nubenco to file [an] answer, but the court, under Nicaraguan law, could still not permit the filing of a counterclaim against [Inversiones and Tecnologia]." Opposition Brief at 8. "[Inversiones and Tecnologia] ... appealed the decision[9] of the [Nicaraguan] [T]rial [C]ourt." *Id.*

### d. *Subsequent Proceedings* [10]

"The contempt of court in [the 1994 Nicaraguan Action] against [Nubenco] was reversed and a further appeal of that decision by ... [Inversiones] and [Tecnologia] has been denied." *See* Letter, dated 14 March 1996, from Counsel for Nubenco ("14 March 1995 Nubenco Letter"). Procedurally, this meant that, although Nubenco "[was] no longer in default in Nicaragua[,] it still [had] no right to file a counterclaim...." *Id.*

Thereafter, "the Nicaragua court ... dismissed the claims in Nicaragua against [Nubenco.]" *See* Letter, dated 9 August 1996, from Counsel for Nubenco ("9 August 1996 Nubenco Letter"). As well, the embargo against Nubenco had been lifted. *See* Letter, dated 3 December 1996, from Counsel for Nubenco ("3 December 1996 I Nubenco Letter"). The entire 1994 Nicaraguan Action is under appeal. *Id.*

### H. *Nubenco's Complaint*

As explained, Nubenco filed the 1995 New Jersey Action on 13 November 1995 in Superior Court.[11] *See, supra,* at 355. Thereafter,

---

**8.** The record does not indicate whether Nubenco appealed the decision of the Nicaraguan Appellate Court to the Nicaraguan Supreme Court. *See* Barberena Certification, ¶ 6.

**9.** It is unclear when the decision to reverse the contempt of court occurred. It is unclear whether Inversiones and Tecnologia appealed the decision allowing Nubenco to file an answer or the decision to reverse the contempt of court.

**10.** The following facts are taken from letters submitted by counsel for Nubenco following the filing of the Motion for Summary Judgment.

Counsel for the Defendants have opposed these letters as untimely, uncertified and not supported by competent evidence. *See* Letters, dated 19 March 1996, 12 August 1996, from Counsel for Defendants. Although not certified under oath or penalty of perjury, there is no reason to doubt the facts, as represented by counsel, concerning the procedural posture of the 1994 Nicaraguan Action.

**11.** Nubenco had filed an earlier complaint ("1994 New Jersey Complaint") action on 4 March 1994 (the "1994 New Jersey Action") against the same Defendants. The 1994 New

the 1995 New Jersey Action was removed to this court. *Id.* The 1995 New Jersey Complaint sets forth five counts against the Defendants, all based upon the law of the State of New Jersey. The 1995 New Jersey Complaint specifically alleges the Defendants are in breach of the April Agreement and the August Agreement. 1995 New Jersey Complaint, count one. The 1995 New Jersey Complaint also sets forth claims against the Defendants based on theories of tortious' interference with contractual relations, *id.,* count two, abuse of process, *id.,* count three, and defamation, *id.,* counts four and five.

*Discussion*

### A. Construing the Defendants' Motion as a Motion for Summary Judgment

The Defendants filed the Motion for Summary Judgment in the posture of a motion to dismiss. Notice of Motion at 1. In support of this motion, however, the Defendants submitted the Barberena Certification and the Defendants' Brief in Support, both of which reference factual matters outside of the pleadings. In opposition to the Defendants' motion, Nubenco submitted the Benzaken Certification and the Nubenco Brief in Opposition, which also refer to factual matters outside of the pleadings.

Before a motion may be converted from a motion to dismiss to a motion for summary judgment, the parties must have had an opportunity to submit additional materials. *Carter v. Stanton,* 405 U.S. 669, 671, 92 S.Ct. 1232, 1234, 31 L.Ed.2d 569 (1972); *Dykes v. Southeastern Pennsylvania Transportation Authority,* 68 F.3d 1564, 1566–67 n. 3 (3d Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 1434, 134 L.Ed.2d 556 (1996); *Pension Benefit Guaranty Corporation v. White Consolidated Industries, Inc.,* 998 F.2d 1192, 1196–97 (3d Cir.1993), *cert. denied,* 510 U.S. 1042, 114 S.Ct. 687, 126 L.Ed.2d 655 (1994).

Both the Defendants and Nubenco submitted data outside of the pleadings. Because

the Defendants and Nubenco have filed submissions beyond the pleadings,[12] and have themselves construed and treated this motion as a motion for summary judgment, no party will suffer from treatment of this motion as a motion for summary judgment. The Defendants' motion was considered as a motion for summary judgment pursuant to Rule 56; the submissions of both parties outside of the pleadings were considered.

### B. Standard of Review for Summary Judgment Motions

To prevail on a motion for summary judgment, the moving parties must establish "there is no genuine issue as to any material fact and that [they are] entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The present task is to determine whether genuine issues of material fact exist and whether the Defendants are entitled to judgment as a matter of law. A district court may not resolve factual disputes in a motion for summary judgment. *Linan–Faye Constr. Co. v. Housing Auth.,* 49 F.3d 915, 926–27 (3d Cir.1995) ("at the summary judgment stage, 'the judge's function is not ... to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial'") (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249–50, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986)); *Desvi, Inc. v. Continental Ins. Co.,* 968 F.2d 307, 308 (3d Cir.1992) ("threshold inquiry is whether there are genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party'") (citations omitted).

In considering a motion for summary judgment, all evidence submitted must be viewed in a light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *Healey v. Southwood Psychiatric Hosp.,* 78 F.3d 128, 130–31 (3d Cir.1996); *General Ce-*

Jersey Action was filed in the Superior Court of New Jersey, Law Division, Bergen County, and was dismissed by the court on 19 October 1994 pursuant to New Jersey Court Rule 1:13–7(a) ("R, 1:13–7(a)") for failure to prosecute. *See* 6 January 1997 Nubenco Letter. The complaints

in the 1994 New Jersey Action and the 1995 New Jersey Action are substantially similar.

**12.** *See* note 1, *supra,* for a description of the submissions.

ramics Inc. v. Firemen's Fund Ins. Cos., 66 F.3d 647, 651 (3d Cir.1995); *Meyer v. Riegel Products Corp.*, 720 F.2d 303, 307 n. 2 (3d Cir.1983) (the court must resolve "all inferences, doubts and issues of credibility ... against the moving party"), *cert. dismissed,* 465 U.S. 1091, 104 S.Ct. 2144, 79 L.Ed.2d 910 (1984).

When the resolution of issues depends wholly upon the interpretation of specific statutory language and the applicable law, summary judgment is appropriate. *See Di-Biase v. SmithKline Beecham Corp.,* 48 F.3d 719, 724 (3d Cir.), *cert. denied,* —— U.S. ——, 116 S.Ct. 306, 133 L.Ed.2d 210 (1995); *see also Gans v. Mundy,* 762 F.2d 338, 341 (3d Cir.) ("summary judgment is proper where the facts are undisputed"), *cert. denied,* 474 U.S. 1010, 106 S.Ct. 537, 88 L.Ed.2d 467 (1985); *Estate of Reddert v. United States,* 925 F.Supp. 261, 265 (D.N.J.1996).

In addition, when the nonmoving party bears the burden of proof at trial, the moving party is entitled to summary judgment by showing "there is an absence of evidence to support the nonmoving party's case." *Celotex,* 477 U.S. at 325, 106 S.Ct. at 2554. Once the movant demonstrates an essential element of the nonmovant's case is lacking, the nonmovant must come forward with sufficient evidence to demonstrate there is a factual controversy as to that element. *Anderson,* 477 U.S. at 247, 106 S.Ct. at 2509–10; *Siegel Transfer, Inc. v. Carrier Express, Inc.,* 54 F.3d 1125, 1130–31 (3d Cir.1995); *Witco,* 38 F.3d at 686. "The mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson,* 477 U.S. at 252, 106 S.Ct. at 2512; *Matsushita,* 475 U.S. at 586, 106 S.Ct. at 1356 (nonmovant must "do more than simply show that there is some metaphysical doubt as to the material facts"); *accord Siegel,* 54

F.3d at 1130–31; *Nevets C.M., Inc. v. Nissho Iwai Am. Corp.,* 726 F.Supp. 525, 534 (D.N.J. 1989), *aff'd without opinion,* 899 F.2d 1218 (3d Cir.1990).

If the nonmovant fails to make a sufficient showing regarding an essential element of its case upon which it will bear the ultimate burden of proof at trial, all other facts are necessarily immaterial and summary judgment must be granted. *Celotex,* 477 U.S. at 321, 106 S.Ct. at 2551–52; *Siegel,* 54 F.3d at 1130–31; *see also Armstrong v. City of Dallas,* 997 F.2d 62, 67 (5th Cir.1993) ("[s]ummary judgment is appropriate where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant, or where it is so overwhelming that it mandates judgment in favor of the movant").

The dispute among the parties in the present motion rests upon the threshold determination of whether the action is barred by the entire controversy doctrine.[13] The Defendants claim this action is barred because, pursuant to the entire controversy doctrine, Nubenco had the opportunity to present its claims in the 1994 Nicaraguan Action. Defendants' Brief in Support, 8. Nubenco argues the entire controversy doctrine does not apply.

### C. *Forum Selection Clause*

■ In the instant matter, Nubenco contends it was required to file its 1995 New Jersey Complaint in New Jersey pursuant to the terms of the August Agreement. Nubenco Brief in Opposition, 12. Nubenco contends that Section VII, ¶ 2 of the August Agreement amounts to a forum selection clause which establishes New Jersey as the exclusive forum in which the parties agreed all matters related to the August Agreement would be litigated. *Id.* Section VII, ¶ 2 of the August Agreement specifically provides:

---

**13.** In addition, Defendants argued that this matter is barred under international comity. Because summary judgment is granted by application of the entire controversy doctrine, comity is not addressed in this opinion.

Similarly, the Defendants appear to seek the dismissal of certain claims by Nubenco on substantive grounds in the third point heading of the

Defendants' Reply. *See* Defendants' Reply, 9–10. They allege the claims asserted by Nubenco are without merit. Because Nubenco has not had an opportunity to respond to these arguments, they will not be addressed. The arguments also appear to raise genuine issues of material fact, which may not be resolved in a motion for summary judgment.

Any dispute arising from this agreement requiring the intervention of a court will be brought before a competent court of the State of New Jersey oer (sic) where the laws of New Jersey permit it.

*Id.*

Assuming *arguendo* Section VII, ¶ 2 of the August Agreement is enforceable, the asserted forum selection clause contained therein is one of limited authority. More specifically, Section VII, ¶ 2 of the August Agreement is limited by its terms to apply to "disputes arising from [the August Agreement]."

Additionally, the asserted forum selection clause did *not* establish New Jersey as the *exclusive* forum where such claims could be pursued. Rather, Section VII, ¶ 2 provides that disputes arising from the August Agreement may be brought in either: (1) the courts of New Jersey or (2) "where the laws of New Jersey permit it." *Id.*

Accordingly, Section VII, ¶ 2 does not establish New Jersey as the exclusive forum in which Nubenco was required to bring its Complaint. To the extent that Section VII, ¶ 2 successfully established New Jersey as a potential forum where claims could be brought, Section VI, ¶ 2 merely conveyed to the parties the option to pursue an action in (1) New Jersey or (2) in another forum "where the laws of New Jersey permit it." Absent a showing that the laws of New Jersey would not permit the parties to file a complaint in Nicaragua, it appears the parties would have been free to do so.[14]

## D. Entire Controversy Doctrine

### 1. General Principles

 The New Jersey entire controversy doctrine [15] "is a particularly strict application of the rule against splitting causes of action." *Bennun v. Rutgers State University,* 941 F.2d 154, 163 (3d Cir.1991), *cert. denied,* 502 U.S. 1066, 112 S.Ct. 956, 117 L.Ed.2d 124 (1992); *see also Kozyra v. Allen,* 973 F.2d 1110, 1111 (3d Cir.1992) ("The doctrine is a broad one, more preclusive than both [claim preclusion] and the Restatement [of Judgments]."). The fundamental goal of the entire controversy doctrine is to promote the adjudication of a legal dispute in one litigation in one court; "accordingly, all parties involved in a litigation should at the very least present in that proceeding all of their claims and defenses that are related to the underlying controversy." *Esoldi v. Esoldi,* 930 F.Supp. 1015 (D.N.J.1996) (citing *DiTrolio v. Antiles,* 142 *N.J.* 253, 267, 662 A.2d 494 (1995)). *See also Prevratil v. Mohr,* 145 *N.J.* 180, 187, 678 A.2d 243 (1996). The doctrine seeks to avoid rendering "the pending litigation merely one inning of the whole ball game." *Circle Chevrolet v. Giordano, Halleran & Ciesla,* 142 N.J. 280, 289, 662 A.2d 509 (1995) (quoting *Wm. Blanchard Co. v. Beach Concrete Co.,* 150 N.J.Super. 277, 294, 375 A.2d 675 (App.Div.), *certif. denied,* 75 N.J. 528, 384 A.2d 507 (1977)).

 The New Jersey Supreme Court has articulated a threefold purpose behind the

---

**14.** Nubenco submits it "has consistently argued that [Section VII, ¶ 2] [precludes] [D]efendants' claim in the Nicaragua court ..., but the Nicaragua court has refused to address [its] argument...." Nubenco Brief in Opposition, 15. Nubenco interprets the Nicaraguan court's refusal to address this argument as "legally infirm and based upon law that, at best, is a codification of a nationalistic 'home court advantage' for Nicaraguan companies and nationals." *Id.* Nubenco contends, therefore, that it had no choice but to defend against [D]efendants' claims in Nicaragua and prosecute its claims under the second contract in New Jersey. *Id.,* 15–16. This argument lacks merit and is undermined by the fact that Nubenco filed affirmative claims in the 1994 Nicaraguan Action pursuant to the 1994 Nubenco Nicaraguan Counterclaim.

As discussed, the governing law provision does not preclude litigation in Nicaragua. According-

ly, it is not evidence of bias that the Nicaraguan Trial Court did not address Nubenco's argument that Nicaragua courts lack subject matter jurisdiction. Nubenco Brief in Opposition,15.

**15.** New Jersey Court Rule 4:30A ("*R.* 4:30A"), codified the entire controversy doctrine and provides,

Non-joinder of claims or parties required to be joined by the entire controversy doctrine shall result in the preclusion of omitted claims to the extent required by the entire controversy doctrine....

*R.* 4:30A. *See also R.* 4:7 (making mandatory counterclaims not asserted subject to preclusion under *R.* 4:30A); *R.* 4:5–1 (requiring identification of any other pending or contemplated action in any other court or arbitration proceeding involving the same controversy)

entire controversy doctrine: "(1) the need for complete and final disposition through the avoidance of piecemeal decisions; (2) fairness to parties to the action and those with a material interest in the action; and (3) efficiency and the avoidance of waste and the reduction of delay." *DiTrolio,* 142 N.J. at 267, 662 A.2d 494. *See also Joel v. Morrocco,* 147 N.J. 546, 547–49, 688 A.2d 1036 (1997).

### 2. *Scope of the Entire Controversy Doctrine*

■ Initially, the doctrine required the joinder of claims arising from "the same overall transaction" involving those parties already named in the lawsuit. *Id.,* at 266, 662 A.2d 494 (quoting *Crispin v. Volkswagenwerk, A.G.,* 96 N.J. 336, 343–44, 476 A.2d 250 (1984)). The New Jersey Supreme Court has extended the entire controversy doctrine, however, to mandate "joinder of all parties with a material interest, one that can affect or be affected by the judicial outcome of a legal controversy." *Cogdell v. Hospital Center,* 116 N.J. 7, 23, 560 A.2d 1169 (1989). The New Jersey Supreme Court reasoned that the party-joinder rule, *R.* 4:28–1, and the claims-joinder rule, *R.* 4:27–1, share a common policy rendering them "not only conceptually similar but ... procedural twins." *DiTrolio,* 142 N.J. at 267, 662 A.2d 494 (quoting *Cogdell,* 116 N.J. at 17, 560 A.2d 1169) (internal quotations omitted).

■ Accordingly, under the doctrine, "a party who has elected to hold back from the first proceeding a related component of the controversy [is] barred from thereafter raising it in a subsequent proceeding." *Joan Ryno v. First National Bank of South Jersey,* 208 N.J.Super. 562, 569, 506 A.2d 762 (App.Div.1986); *see Bennun,* 941 F.2d at 163 (entire controversy doctrine precludes claims that could have been litigated, as well as claims that have been litigated, in previous lawsuit).

■ The entire controversy doctrine applies as well to constituent claims that arise during the first action which were known to the litigant. *Circle Chevrolet,* 142 N.J. at 290, 662 A.2d 509 (citations omitted) (holding that entire controversy doctrine barred subsequent malpractice action against attorney and accountant when those claims could have been asserted in underlying action). *See also Mystic Isle Development Corp. v. Perskie & Nehmad,* 142 N.J. 310, 662 A.2d 523 (1995). *Contra Federal Deposit Insurance Corp. v. Jeffrey S. Mintz,* 948 F.Supp. 428 (D.N.J.1996) (declining to employ entire controversy doctrine to bar malpractice action brought by FDIC where matter did not have same common nucleus of operative facts of previous action); *Olds v. Donnelly,* 291 N.J.Super. 222, 677 A.2d 238 (App.Div.) (refusing to apply entire controversy doctrine where cause of action for legal malpractice did not accrue until prior action was dismissed), *certif. granted,* 146 *N.J.* 565, 683 A.2d 1161 (1996).

■ The key consideration in determining whether claims constitute one controversy for the purposes of the doctrine is "whether the claims arise from related facts or the same transaction or series of transactions." *DiTrolio,* 142 N.J. at 267, 662 A.2d 494. If distinct claims against the same or different parties arise from a "core set of facts," the entire controversy doctrine is triggered and the parties are required to address the claims in one proceeding. *Id.* at 267–68, 662 A.2d 494.

■ The Third Circuit has articulated a test for whether claims are "related" such that they constitute a core set of facts and, therefore, must be brought in a single action:

[If] the litigants in the action as framed will, after final judgment therein is entered, be likely to engage in additional litigation in order to conclusively dispose of their respective bundles of rights and liabilities which derive from a single transaction or related series of transactions, then the omitted component must be regarded as constituting an element of the minimum mandatory unit of litigation.

*O'Shea v. Amoco Oil Co.,* 886 F.2d 584, 590–91 (3d Cir.1989) (quoting *Melikian v. Corradetti,* 791 F.2d 274, 279–80 (3d Cir.1986)).

■ This doctrine is not interpreted to require commonality of legal issues. The entire controversy doctrine is not rendered ineffective because the actions are based

upon distinct legal theories. *DiTrolio,* 142 N.J. at 271, 662 A.2d 494. One core set of facts can give rise to discrete causes of action and different kinds of relief. *Id.* The central consideration is whether distinct claims are aspects of a single controversy because they arise from interrelated facts. *Id.*

■ Accordingly, a party bringing an action based on two distinct legal theories is required to bring such claims together in one proceeding. *Id.* (citing *Aetna Ins. Co. v. Gilchrist Bros. Inc.,* 85 N.J. 550, 556–57, 428 A.2d 1254 (1981) ("party [must] include in the action all related claims against an adversary and its failure to do so precludes the maintenance of a second action."); *New Jersey Highway Auth. v. Renner,* 18 N.J. 485, 492, 114 A.2d 555 (1955) ("Our judicial system contemplates that generally all matters in controversy between the parties, whether legal or equitable, will be disposed of in a single action.")). This includes all affirmative claims that a party might have against another party, including counterclaims and cross-claims, *Circle Chevrolet,* 142 N.J. at 289, 662 A.2d 509 (citing *Ajamian v. Schlanger,* 14 N.J. 483, 487–89, 103 A.2d 9, *cert. denied,* 348 U.S. 835, 75 S.Ct. 58, 99 L.Ed. 659 (1954)), as well as joinder of all parties with a material interest in the controversy. *Id.* (citing *Cogdell,* 116 N.J. at 23, 26, 560 A.2d 1169; *R.* 4:30A). *See also Prevratil,* 145 N.J. at 187, 678 A.2d 243.

The Defendants seek to bar the instant matter pursuant to the entire controversy doctrine. They argue that the 1994 Nicaraguan Action and the 1995 New Jersey Action are based on nearly identical claims, involve the same parties and emanate from the same core set of facts. Defendants' Reply, 1–3. In the 1994 Nicaraguan Action, it appears that Inversiones and Tecnologia allege claims and seek damages against Nubenco for breach of the April Agreement. Barberena

Certification, ¶ 5. Nubenco was barred from filing an answer and counterclaim in the 1994 Nicaraguan Action due to rules which rendered such pleadings untimely; also, Nubenco lacked the requisite power of attorney pursuant to Nicaraguan law. Barberena Certification, ¶ 6.

Nubenco contends it filed the 1995 New Jersey Complaint against the Defendants in the 1995 New Jersey Action "after it became apparent that Nubenco [could not] obtain adequate affirmative relief against all of the [D]efendants in the Nicaragua court." Benzaken Certification, ¶ 16. The 1995 New Jersey Action alleges breach of both agreements and additionally sets forth claims of tortious conduct.[16] *See* 1995 New Jersey Complaint. As will be discussed further, it appears the subject matter and the parties to the 1994 Nicaraguan Action and the 1995 New Jersey Action are the same and emanate from the same core set of facts. Indeed, if these actions had both been brought in New Jersey, the second action would be barred under the entire controversy doctrine. Moreover, the filing and dismissal of the 1994 New Jersey Action, *see* n. 11, *supra,* further supports this observation. *See* n. 22, *infra.*

■ The New Jersey Supreme Court, however, has not ruled on the application of the entire controversy doctrine as it applies to the facts of this case. The question here is whether the entire controversy doctrine may be applied to bar the subsequently filed 1995 New Jersey Action because the Defendants filed an earlier action which was pending in an extra-territorial jurisdiction located outside of the United States.[17] Based upon the facts presented in the instant matter, invocation of the entire controversy doctrine is appropriate.

---

**16.** At times, it appears in the submissions of Nubenco that the 1995 New Jersey Action is brought only pursuant to the August Agreement. *See, e.g.,* Benzaken Certification, ¶ 9; Nubenco Brief in Opposition, 21. The 1995 New Jersey Complaint, however, refers to the breach of both agreements. *See* 1995 New Jersey Complaint, count one.

**17.** When resolving matters of first impression with respect to the entire controversy doctrine, the task is to determine how the New Jersey Supreme Court would decide the issue. *Kelly v. Borough of Sayreville,* 927 F.Supp. 797, 800 & n. 1 (D.N.J.1996) (citing *Blum v. Witco Chemical Corp.,* 829 F.2d 367, 376 (3d Cir.1987)), *affirmed on other grounds,* 107 F.3d 1073 (3d Cir.1997); *cf. McKenna v. Pacific Rail Serv.,* 32 F.3d 820, 825 (3d Cir.1994).

### 3. Extension of Entire Controversy Doctrine to Foreign Jurisdictions

While the entire controversy doctrine has been expanded over time, "[t]he bounds of the entire controversy doctrine ... are not unlimited." *Circle Chevrolet*, 142 N.J. at 294, 662 A.2d 509 (citing *Cogdell*, 116 N.J. at 27–28, 560 A.2d 1169). Application of the entire controversy doctrine is discretionary and clarification of the limits of the doctrine is left to case-by-case determination. *Circle Chevrolet*, 142 N.J. at 290, 662 A.2d 509; *Cogdell*, 116 *N.J.* at 27–28, 560 A.2d 1169.

The Third Circuit noted the problems associated with the extra-territorial application of the entire controversy doctrine in *Electro–Miniatures Corp. v. Wendon*, 889 F.2d 41, 45 & n. 6 (3d Cir.1989) (determining the preclusive effect of a prior out of state judgment in subsequent New Jersey action). The Circuit stated that such an application raises the theoretical possibility that "New Jersey would be imposing on litigants and courts in other states its policy choice to encourage parties to litigate all claims, defenses, issues and remedies related to a particular transaction." *Id.*

In *Mortgagelinq Corp. v. Commonwealth Land Title*, 142 N.J. 336, 662 A.2d 536 (1995), however, the New Jersey Supreme Court held that "when a party deliberately chooses to fragment litigation by suing certain parties in another jurisdiction and withholds claims against other parties, a New Jersey Court need not later entertain the claims against the omitted parties if jurisdiction was available in the first forum." *Id.* at 338, 662 A.2d 536.

*Mortgagelinq* involved a fraud operation that occurred in New Jersey and Pennsylvania. The plaintiffs filed two suits against different defendants, first in a Federal court located in Pennsylvania and then in the state court of New Jersey. The New Jersey Supreme Court held that procedural fairness precluded claims brought in New Jersey if those claims could have been brought earlier

in litigation elsewhere. *Id.* at 338, 662 A.2d 536.

The court emphasized that the ruling did not work to export the entire controversy doctrine to other jurisdictions and stated that the ruling "presupposes that when the procedural rules of foreign jurisdictions permit the omitted claims to be brought later, the foreign jurisdiction is free to entertain such claims." *Id.* The court cautioned, however, that attorneys conducting litigation in foreign jurisdictions "should not have to accommodate their practices to the demands of New Jersey courts." *Id.* at 345, 662 A.2d 536.

Other cases have also addressed the application of the entire controversy doctrine to actions brought outside the state courts of New Jersey. *See Itzkoff v. F & G Realty of New Jersey Corp.*, 890 F.Supp. 351 (D.N.J. 1995) (employing entire controversy doctrine to bar Federal suit when plaintiff failed to assert direct claims against defendant in earlier New York action, where defendant was already a third-party defendant); *Research & Trading Corp. v. Safety Tech. Syst. Inc.*, Civ. No. 93–2362, 1994 WL 114553, at *1 (D.N.J.29 March 1994) (barring claims of plaintiff that were not exclusively Federal and could have been brought in prior Delaware action); *Giudice v. Drew Chemical Corp.*, 210 N.J.Super. 32, 42, 509 A.2d 200 (App.Div.1986) (plaintiff, "who was in control of the litigation must suffer the preclusionary consequences of the entire controversy doctrine" because he elected to hold back from the earlier New York litigation claims asserted in the subsequent New Jersey action), *certif. granted and summarily remanded on other grounds*, 104 N.J. 654, 517 A.2d 448 (1986); *Gross v. Cohen DuFour & Assoc.*, 273 N.J.Super. 617, 624, 642 A.2d 1074 (Law Div.1993) (entire controversy doctrine bars a state court action against parties which could have been joined in previous Federal action); *but see Kimmins Abatement Corp v. Conestoga–Rovers & Assoc., Inc.*, 253 N.J.Super. 162, 601 A.2d 256 (Law Div.1991).[18] These

---

**18.** In *Kimmins,* the trial court refused to extend the entire controversy doctrine to preclude "a second lawsuit against a defendant who was not a party to a first lawsuit in another state." *Kim-*

*mins,* 253 N.J.Super. at 166, 601 A.2d 256. The New Jersey Supreme Court in *Mortgagelinq* questioned the precedential value of *Kimmins* and stated that its holding was "clouded by specula-

decisions are distinguishable from the facts of the instant matter. The distinctions, however, do not necessarily weaken their precedential effect.

### a. *Effect on a Counterclaim*

■ First, in the above-mentioned decisions, the plaintiff was the same party in both the prior and subsequent actions. As "master of the complaint," the plaintiff was in control of the litigation and had the opportunity to litigate the barred claims in the prior proceeding. Accordingly, "a plaintiff—who is presumably in control of his litigation—must generally suffer the preclusionary consequences of the entire controversy doctrine." *Itzkoff,* 890 F.Supp. at 358. *See also Prevratil,* 145 N.J. at 196, 678 A.2d 243 (recognizing special considerations when applying entire controversy doctrine to automobile insurance litigation, where New Jersey plaintiff was represented as a defendant in foreign action by designee of the carrier); *Erenberg v. Cordero, et al.,* 294 N.J.Super. 352, 361, 683 A.2d 567 (App.Div.1996) (New Jersey suit not barred where, among other details, one plaintiff and defendant were not parties to earlier action); *Esoldi,* 930

F.Supp. at 1027 (noting that "the doctrine is typically applied defensively in a second suit brought by the same plaintiff").

The plaintiff in the 1995 New Jersey Action, Nubenco, is the defendant/counterclaim plaintiff in the 1994 Nicaraguan Action. The facts indicate that not only did Nubenco attempt to answer the 1994 Nicaraguan Complaint, it also tried to assert affirmative claims in the form of a counterclaim in the 1994 Nicaraguan Action. Barberena Certification, ¶ 5. Nubenco attempted to file the 1994 Nubenco Nicaraguan Answer and 1994 Nubenco Nicaraguan Counterclaim on 3 March 1994.[19] Ultimately, Nubenco was able to file its answer to the 1994 Nicaraguan Complaint, however the 1994 Nubenco Nicaraguan Counterclaim was barred due to "other procedural matters." Benzaken Certification, ¶ 24.

While affirmatively litigating in the 1994 Nicaraguan Action, the record also indicates Nubenco filed the 1994 New Jersey Complaint on or about 4 March 1994.[20] The 1994 New Jersey Complaint was dismissed without prejudice by the Superior Court in October 1994 for failure to prosecute, pursuant to R. 1:13–7(a).[21] *See* 6 January 1996 Nubenco

---

tion concerning the issue of personal jurisdiction" over the defendants in the previous lawsuit. *Mortgagelinq,* 142 N.J. at 344, 662 A.2d 536.

19. Counsel submitted translated versions of the 1994 Nubenco Nicaraguan Answer and 1994 Nubenco Nicaraguan Counterclaim. The final page of these submissions states: "Filed by Dr. Roberto Ortiz Urbina, at noon on March three nineteen-hundred ninety-four...." *See* 1994 Nubenco Nicaraguan Answer and 1994 Nubenco Nicaraguan Counterclaim, 31, attached to 27 January 1997 Nubenco Letter and 21 February 1997 Defendant Letter.

20. The Benzaken Certification stated: "Nubenco had filed and then dismissed without prejudice an earlier complaint [in the 1994 New Jersey Action] against [D]efendants in 1994 upon the advice of Nicaraguan counsel that such filing might be prejudicial to Nubenco's receiving a hearing on its motion to dismiss the [1994] Nicaraguan [A]ction on jurisdictional grounds based on the [D]efendants' contractual agreement to litigate in New Jersey." Benzaken Certification, ¶ 16.

Because it was unclear as to whether the earlier filing was in New Jersey or Nicaragua, Nubenco was directed to submit the caption, docket number and dates of filing and dismissal for this

action. The 6 January 1997 Nubenco Letter stated:

The caption of the 1994 [New Jersey] Complaint was *Nubenco Enterprises, Inc. v. Inversiones Barberena S.A. (Inbarsa). Technologia Media International S.A. (Meditech) and Alonso Lacavo B..* The docket number was BER–L–2122094. The date of filing was March 4, 1994.

The dismissal was accomplished by the Court without prejudice on October 19, 1994 pursuant to R. 1:13–7(a) for want of prosecution.

6 January 1997 Nubenco Letter.

21. Rule 1:13–7(a) states,

[W]henever any civil action shall have been pending in any court for 6 months without any required proceeding having been taken therein, the Clerk of the Superior Court or the deputy clerk of the Superior Court in the county of venue, shall give to the parties or their attorneys written notice of a motion by the court to dismiss the same for want of prosecution. The notice shall advise that unless an affidavit is filed with the court at least 5 days prior to the return date explaining the delay and why the action should not be dismissed, the action will be dismissed without call. For

Letter.[22] The 1994 New Jersey Complaint is substantially similar to the 1995 New Jersey Complaint; it demonstrates that Nubenco knew of its causes of action against the Defendants at all relevant times.

Nubenco filed the 1995 New Jersey Action after, it argues, "it became apparent that Nubenco [could not] obtain affirmative relief against all of the defendants in the Nicaraguan court." Benzaken Certification, ¶ 16. The facts demonstrate, however, that Nubenco had an opportunity to litigate its claims in the 1994 Nicaraguan Action, and affirmatively did so, but did not timely file them or failed to comply with Nicaraguan procedural rules. Barberena Certification, ¶ 6; Benzaken Certification, ¶¶ 23–24.

### b. Geographic Differences

The second difference is geographic. In *Mortgagelinq* and the cases cited above, extraterritorial application of the entire doctrine controversy barred matters where the earlier litigation was pursued within the United States. Here, the earlier litigation alleged by the Defendants is in Nicaragua. Citing *Mortgagelinq*, the Defendants state: "clearly, New Jersey will apply earlier actions and proceedings which occur in foreign courts to its entire controversy doctrine analysis ... and bar claims which were or could have been brought earlier." Defendants'

Brief in Support, 8. Although the entire controversy doctrine may not have been previously applied to encompass courts outside of the United States, it is appropriate in these circumstances.

Central to the *Mortgagelinq* decision was the fact that the plaintiff had the opportunity to litigate the claims in the initial forum and that the initial court would carefully consider those claims. *Mortgagelinq*, 142 N.J. at 348, 662 A.2d 536. As discussed above, Nubenco had an earlier opportunity to litigate its claims in a court of law in the 1994 Nicaraguan Action. Due to non-compliance with Nicaraguan procedural requirements, however, Nubenco could not affirmatively pursue its claims in Nicaragua.

### c. Issue Joinder

Nubenco additionally attempts to distinguish *Mortgagelinq* on the ground that the court limited the scope of its holding to joinder of parties, whereas here the Defendants seek to have the court compel joinder of issues. *See* Nubenco Brief in Opposition, 13. This difference is not dispositive. As discussed above, the entire controversy compels litigants at the risk of preclusion to assert *all* claims in a single controversy. *Prevratil*, 145 N.J. at 190, 678 A.2d 243. Moreover, it is the mandatory joinder of parties, rather

purposes of this rule, adjournments, extensions of time, and applications, motions or hearings in connection therewith, shall not be considered a proceeding taken. Unless otherwise ordered by the court, a dismissal under this rule shall be without prejudice.

*R.* 1:13–7(a).

22. This situation is distinguishable from *Hulmes v. Honda Motor Co. Ltd.*, 924 F.Supp. 673 (D.N.J. 1996). In *Hulmes*, the court refused to grant summary judgment pursuant to the entire controversy doctrine where the prior action was dismissed by the plaintiffs voluntarily. *Hulmes* was a "John Doe" action that was inadvertently dismissed with prejudice one week after it was filed. *Id.* at 678. The court found the "John Doe" action did not rise to the level of a prior adjudication to trigger the entire controversy doctrine, *id.* at 680, and did not represent a situation where the plaintiffs deliberately withheld their claims. *Id.* at 681.

Here, Nubenco knew of its claims and the parties against whom to bring them as evidenced by the fact that it filed the 1994 Nubenco Nicara-

guan Counterclaim in Nicaragua as well as the 1994 New Jersey Complaint in the 1994 New Jersey Action. Nubenco was represented by counsel in each forum. The 1994 New Jersey Action was dismissed by the court seven months after it was filed due to lack of prosecution. See 6 January 1997 Nubenco Letter. From the Benzaken Certification, *see*, note 21, *supra*, it appears Nubenco chose not to prosecute its claims in the 1994 New Jersey Action for strategic reasons relevant to the 1994 Nicaraguan Action. *See* Benzaken Certification, ¶ 16.

The 1994 New Jersey Complaint was dismissed without prejudice and may not serve as a basis for dismissal pursuant to the entire controversy doctrine. The existence of the 1994 New Jersey Complaint, however, demonstrates Nubenco was aware of its claims against the Defendants and chose to bifurcate the litigation, pursuing certain claims in New Jersey, via the 1994 New Jersey Complaint and the 1995 New Jersey Complaint, and certain claims in Nicaragua, via the 1994 Nubenco Nicaraguan Counterclaim. It is this type of piecemeal litigation that is proscribed by the entire controversy doctrine.

than the mandatory joinder of claims, which has evolved more tentatively and evoked more criticism. *Id.; Hulmes,* 924 F.Supp. at 679. Here, the claims in the 1995 New Jersey Action are not entirely factually separable from the 1994 Nicaraguan Action to defeat application of the entire controversy doctrine. *See Gelber v. The Zito Partnership,* 147 N.J. 561, 562–64, 688 A.2d 1044 (1997) (remanding matter to Law Division to determine if any claims in subsequent litigation were entirely separable from claims related to contractor in earlier arbitration to survive entire controversy doctrine).

### 4. *Lack of Determination on the Merits*

██ Nubenco also contends the entire controversy is inapplicable because, at the time the motion was filed, the 1994 Nicaraguan Action did not contain a judgment that was "valid, final and on the merits." Nubenco Brief in Opposition, 10 (citing *Watkins v. Resorts International Hotel & Casino, Inc.,* 124 N.J. 398, 412, 591 A.2d 592 (1991) and *Federated Department Stores v. Moitie,* 452 U.S. 394, 398, 101 S.Ct. 2424, 2427–28, 69 L.Ed.2d 103 (1981)). Nubenco argues that, because its claims have not been addressed on the merits in the 1994 Nicaraguan Action, the 1995 New Jersey Action should not be dismissed. Nubenco Brief in Opposition, 11. The key consideration here, however, is whether the claims could have been addressed in another litigation. *See Bernardsville Quarry v. Borough of Bernardsville,* 929 F.2d 927, 930 (3d Cir.), *cert. denied,* 502 U.S. 861, 112 S.Ct. 182, 116 L.Ed.2d 144 (1991).

██ Both *Watkins* and *Moitie,* cited by Nubenco, discuss the doctrine of claim preclusion, which directs that a "final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action." *Moitie,* 452 U.S. at 398, 101 S.Ct. at 2428. The entire controversy doctrine, however, reaches far more broadly and encompasses "all aspects of a controversy that might have been litigated and determined." *Kelly,* 927 F.Supp. at 802 n. 4 (citing *Mori v. Hartz Mountain Development Corp.,* 193 N.J.Super. 47, 55–56, 472 A.2d 150

(App.Div.1983)), *see also Mortgagelinq Corp. v. Commonwealth Land Title Ins. Co.,* 262 N.J.Super. 178, 182, 620 A.2d 456 (Law Div. 1992), *aff'd,* 275 N.J.Super. 79, 645 A.2d 787 (1994), *affirmed in part and reversed in part,* 142 N.J. 336, 662 A.2d 536 (1995) (noting that the *Watkins* decision affirmed the principle that the entire controversy doctrine was broader than Federal law of claim preclusion).

██ Because the entire controversy doctrine is based upon fairness and efficiency, it follows that, "the entire controversy doctrine may preclude an action that is not otherwise precluded by the [F]ederal law of [claim preclusion]." *Watkins,* 124 N.J. at 412, 591 A.2d 592 (citing *Blazer Corp. v. New Jersey Sports and Exposition Auth.,* 199 N.J.Super. 107, 488 A.2d 1025 (1985) (barring subsequent action where claims were judicially cognizable but not brought in prior proceeding)). *Cf. Mortgagelinq Corp.,* 262 N.J.Super. at 183, 620 A.2d 456 (employing entire controversy doctrine to dismiss the New Jersey action despite lack of previous final judgment against them, or any of the other defendants and while Pennsylvania litigation was still awaiting trial); *DiTrolio,* 142 N.J. at 253, 662 A.2d 494 (employing entire controversy doctrine despite fact that prior litigation was dismissed without prejudice).

The instant matter is distinguishable from the decision in *Jones v. Holvey,* 29 F.3d 828 (3d Cir.1994), *cert. denied,* —— U.S. ——, 116 S.Ct. 1329, 134 L.Ed.2d 480 (1996). In *Jones,* the Circuit held:

> [U]nder the entire controversy doctrine, a party will not be barred from raising claims that he could not have brought in the initial action. As the New Jersey Supreme Court has stated, if the court in the first action would clearly not have had jurisdiction to entertain the omitted theory or ground (or, having jurisdiction, would clearly have declined to exercise it as a matter of discretion), then a second action in a competent court presenting the omitted theory or ground should not be held precluded.

*Id.; see also Kelly v. Borough of Sayreville,* 107 F.3d at 1079–80 (concurrence). In

*Jones,* the plaintiff was a prisoner who brought a civil rights claim in Federal court against employees of the New Jersey Department of Corrections. The plaintiff had been found guilty of attempting to possess weapons in an earlier administrative hearing conducted by the defendants. This decision was reversed on appeal to the Superior Court of New Jersey, Appellate Division ("Appellate Division") for lack of substantial evidence. *Id.* at 829. In the subsequent Federal action, the district court held the civil rights claim could have been raised in the state court proceeding and granted defendants' motion for summary judgment on the grounds of claim preclusion and the entire controversy doctrine.

The Circuit reversed the application of the entire controversy doctrine stating that a party will not be barred from raising claims that he could not have brought in the initial action. *Id.* at 831 (citing *Watkins*). The Circuit predicted the New Jersey Appellate Division court would have declined to exercise jurisdiction over the plaintiff's Section 1983 claim "based in part on the sparsity of the complaint." *Id.* at 832. *See also Kelly,* 107 F.3d at 1078–79 (where hearing examiner in earlier litigation expressly declined to hear claim brought in subsequent litigation, claim was not adjudicated for purposes of entire controversy doctrine) (concurrence).

Neither the Defendants nor Nubenco have expanded upon the rules or reasons why Nubenco was precluded from presenting the 1994 Nubenco Nicaraguan Counterclaim. The Defendants assert the 1994 Nubenco Nicaraguan Counterclaim was untimely and the attorney who filed the 1994 Nubenco Nicaraguan Counterclaim "did not hold a Power of Attorney from Nubenco at the time of the filing — a requirement under Nicaraguan law." Barberena Certification, ¶ 6. Nubenco further claims it is "unable to file a counterclaim because of other procedural matters." Benzaken Certification, ¶ 24. This is not a situation where the forum of the earlier litigation did not have jurisdiction to entertain the omitted theory, or, having jurisdiction, declined to exercise it as a matter of discretion. *See Jones,* 29 F.3d at 831; *Kelly,* 107 F.3d at 1079–80. Rather, the Nicaraguan court had jurisdiction over the

claim, but could not entertain it due to the insouciant actions of Nubenco. The Nicaraguan courts did not decline to hear the claims as a matter of discretion. Rather, it appears the Nicaraguan courts had jurisdiction, but were precluded from exercising it because of the posture of the case resulting from the action, or lack of action, on the part of Nubenco.

Although the dismissal of the 1994 Nubenco Nicaraguan Counterclaim in the 1994 Nicaraguan Action was not on the merits, this should not preclude application of the entire controversy doctrine. The errors committed by Nubenco, though procedural, were fatal to its claims. An analogous situation in American jurisprudence is where a matter is barred for failure to comply with a statute of limitations. Such a procedural error will bar litigation, even though the claims were not adjudicated on the merits. *Cf. Blazer,* 199 N.J.Super. at 113, 488 A.2d 1025.

■ Nubenco has not explained why it was unable to conform to It the Nicaraguan rules in order to litigate its claims. As stated, the entire controversy doctrine is a doctrine of fairness. "New Jersey courts need not necessarily grant relief when parties deliberately refrain from seeking relief in other jurisdictions when doing so would have been fairer to all parties involved." *Mortgagelinq,* 142 N.J. at 345, 662 A.2d 536. What is significant is whether the party was accorded a "full and fair opportunity to litigate in the first forum." *Watkins,* 124 N.J. at 411, 591 A.2d 592. Nubenco does not contend that the procedural rules with which it failed to comply violated due process or were otherwise unreasonable, denying it a fair and full opportunity to litigate in the 1994 Nicaraguan Action. Accordingly, the lack of a determination on the merits of the 1994 Nubenco Nicaraguan Counterclaim will not bar application of the entire controversy doctrine.

The record shows Nubenco filed its answer and affirmatively asserted its counterclaim on 3 March 1994. On 4 March 1994, Nubenco filed the 1994 New Jersey Action, which was later dismissed without prejudice for failure to prosecute. On 13 November 1995,

Nubenco filed the 1995 New Jersey Action, which contains claims substantially similar to the 1994 New Jersey Action. These facts demonstrate Nubenco knew of its causes of action, but chose to bifurcate them in different fora, a tactic contrary to the purposes behind the entire controversy doctrine. These facts undermine Nubenco's argument that application of the entire controversy doctrine would be unfair.

### 5. Alleged Prejudice in Nicaragua

■ Nubenco submits "it is clear from the procedural history of the Nicaraguan [A]ction that the Nicaraguan judicial process has none of the minimal procedural requirements and safeguards that exist in all courts in the United States." Nubenco Brief in Opposition, 14; Benzaken Certification, ¶ 18. What the record demonstrates, rather, is that Nubenco was precluded from filing an answer and counterclaim because they were untimely and violated a Nicaraguan requirement that the attorney who filed the 1994 Nubenco Nicaraguan Answer and 1994 Nubenco Nicaraguan Counterclaim hold a power of attorney from Nubenco at the time of filing. Barberena Certification, ¶ 6. This is not unusual. American rules of civil procedure similarly provide for the striking of untimely or improper pleadings. *See, e.g.,* Fed.R.Civ.P. 12. Simply because an action is litigated in another country, a question of whether there is equality of forum does not automatically arise.[23] *Perry v. Tuzzio,* 288 N.J.Super. 223, 230, 672 A.2d 213 (App.Div. 1996) (equality of forum exists when "the first forum [is] . . . able to provide all parties with the same full and fair opportunity to litigate the issues and with the same remedial opportunities as the second forum.") (citing *Thornton v. Potamkin Chevrolet,* 94 N.J.

1, 5, 462 A.2d 133, (1983)); *Cafferata,* 251 N.J.Super. at 261, 597 A.2d 1101)). *See also Hernandez v. Region Nine Housing Corp.,* 146 N.J. 645, 661, 684 A.2d 1385 (1996) (failure to raise claim in EEOC administrative forum will not bar later attempt to litigate in Superior Court because of lack of equality of forum; "EEOC cannot render a final enforceable judgment."); *B.F. v. Division of Youth and Family Servs.,* 296 N.J.Super. 372, 382, 686 A.2d 1249 (App.Div.1997) (entire controversy doctrine did not bar subsequent civil rights actions where first action was summary action brought by Division of Youth and Family Services to expeditiously terminate parental rights).

The statement that Nubenco does not believe that it "can receive a fair hearing on all of its affirmative claims against all of the defendants based on the history of that action," Benzaken Certification, ¶ 18, is not supported by the record. Nubenco appears to have had the opportunity to litigate its claims in the 1994 Nicaraguan Action. It affirmatively attempted to do so through the 1994 Nubenco Nicaraguan Counterclaim, but failed to comply with Nicaraguan rules of procedure and, therefore, was barred.

Nubenco also contends the Nicaraguan forum is prejudicial because the Defendants' strategy in the 1994 Nicaragua Action relies upon a law that remains from the Sandinista regime that was intended solely to benefit Nicaragua nationals at the expense of foreign businesses. Defendants assert that this law, in effect, gives a Nicaraguan the right to be a foreign company's agent in perpetuity if the parties execute a master agency agreement. This, of course, is why [the] [D]efendants have fabricated

---

**23.** Nubenco suggests that the embargo instituted by the Nicaragua Ministry of Economy, at the request of the Defendants, is evidence of the prejudicial environment in the 1994 Nicaraguan Action. Nubenco Brief in Opposition, 8–9. It is unclear how the embargo, imposed by the Nicaraguan Ministry of Economy through extra-judicial channels, demonstrates a bias in the Nicaraguan courts system. Indeed, it appears that although Inversiones and Tecnologia requested that "[the court] order the Ministry of Economy . . . to hold all imports, internment or distribution of pharmaceutical products, medical sup-

plies in general, that could be sold, or distributed (directly or indirectly) by [Nubenco] in the Republic of Nicaragua," *see* 1994 Nicaraguan Complaint, 3–4 (Defendants' Translation), "[the court] did not comply with [Inversiones and Tecnologia's] wish to halt the imports and distribution of [Nubenco's] products in Nicaragua." *See* 1994 Nubenco Nicaraguan Answer, 14 (Defendants' Translation); *see also* 1994 Nubenco Nicaraguan Answer, 28–29 (Nubenco's Translation). In any event, the embargo was lifted. *See* 3 December 1996 Nubenco Letter.

their specious position concerning the "transformation" of the parties' [April Agreement] into a master agency agreement.

Benzaken Certification, ¶ 26. Nubenco did not present in its brief any additional information regarding this law. The mere existence of this law, however, is an insufficient basis to suggest the 1994 Nicaraguan Action would not be litigated fairly. The argument has only been advanced by the Defendants in support of their litigation. It is not certain that the Defendants will prevail in the 1994 Nicaraguan Action based upon this law or that the courts of Nicaragua will employ this law and characterize the April Agreement as a master agency agreement, effectively binding Nubenco to contract with the Defendants "in perpetuity." [24] Id. As well, the fact that Nubenco chose to affirmatively participate in the 1994 Nicaraguan Action by filing the 1994 Nubenco Nicaraguan Counterclaim undermines its claim of prejudice in the Nicaraguan forum. Accordingly, this argument is not sufficient to defeat application of the entire controversy doctrine.[25]

### 6. Tort Claims

Nubenco further contends it is unable to pursue its claims of defamation and misappropriation of trade secrets[26] in Nicaragua because they are considered criminal, not civil, causes of action. Benzaken Certification, ¶ 15. The only evidence Nubenco offered for this assertion was the Benzaken Certification. The Defendants argue that the mere assertion by Nubenco that the claims are not cognizable in Nicaragua is insufficient. Defendants' Reply, 7 (citations omitted). The Defendants argue further that the August Agreement explicitly provided that New Jersey law would govern any disputes, and, therefore, the claims arising pursuant to that agreement would be viable

---

24. Indeed, the fact that the "Nicaraguan court has ... dismissed the claims in Nicaragua against [Nubenco]," see 9 August 1996 Nubenco Letter, further undermines Nubenco's argument. It appears the 1994 Nicaraguan Action is under appeal. See 3 December 1996 Letter.

25. In addition, it is not clear, that, under a choice of law analysis, the Nicaraguan law would not be applicable in a New Jersey action brought pursuant to the April Agreement.

Unlike the August Agreement, the April Agreement did not specify that New Jersey law will apply. The April Agreement was modified in Nicaragua, signed in Nicaragua and encompassed activities that were to occur in Nicaragua. It is not clear that, even if the 1995 New Jersey Action were to proceed, New Jersey law would apply to claims arising out of the April Agreement. Cf. Gantes v. Kason Corp., 145 N.J. 478, 484, 679 A.2d 106 (1996) ("New Jersey's [choice-of-law] rule applies a flexible 'governmental-interest' standard, which requires application of the law of the state with the greatest interest in resolving the particular issue that is raised in the underlying litigation."); Almog v. Israel Travel Advisory Serv., 298 N.J.Super. 145, 689 A.2d 158 (App.Div.1997) ("conflicts of law analysis requires the court first to identify the disparity in the law of each jurisdiction and then to identify the governmental policies of each underlying its own law"); Dynalectric Company v. Westinghouse Elec. Corp., 803 F.Supp. 985, 988–89 (D.N.J.1992) ("In determining which state's law applies to a given matter, New Jersey courts apply a governmental relationship test."); Republic of the Phillippines v. Westinghouse Elec.

Corp., 774 F.Supp. 1438, 1449 (D.N.J.1991) ("case law demands that we consider a number of factors, as they relate to the relevant policy interests of the competing jurisdictions").

As an American company doing business in Nicaragua, Nubenco should have expected that it was exposing itself to a foreign forum and to foreign laws. If it perceived those laws to be unfair, it should have taken steps contractually to protect itself in the April Agreement. A "plaintiff [may not] seek to use New Jersey's court system to litigate a dispute that has only a slight link to New Jersey and where the only plausible reason to select this State is because it is a hospitable forum." Id., at 492, 679 A.2d 106. Compare Henry v. Richardson–Merrell, Inc., 508 F.2d 28, 35 (3d Cir.1975) (facts indicated that New Jersey had no substantial interest in suit so as to authorize application of New Jersey law)

26. In the 1995 New Jersey Complaint, Nubenco alleges that the "[D]efendants have further violated and breached its contracts with Nubenco by usurping and utilizing for their own benefit, confidential information, trade secrets, and proprietary information belonging to Nubenco and obtained from Nubenco in confidentiality under their aforesaid contracts with Nubenco." Complaint, ¶ 5 (internal quotations omitted).

This claim for misappropriation of trade secrets is presented under the first count of the 1995 New Jersey Complaint, which generally alleges breach of contract. The 1995 New Jersey Complaint does not indicate which of the April Agreement or August Agreement was breached to create this claim.

in Nicaragua.[27] Defendants' Reply, 8 & n. 4.

In a motion for summary judgment the facts are taken in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co.*, 475 U.S. at 587, 106 S.Ct. at 1356; *Healey*, 78 F.3d at 130–31. The Defendants appear to suggest Nubenco should have submitted Nicaraguan statutes or case law before its contention is accepted as true. Pursuant to Rule 27A of the General Rules Governing the District of New Jersey ("Local Rule 27A"), "[a]ffidavits shall be restricted to statements of fact within the personal knowledge of the affiant." *Id.* The Benzaken Certification states, *"It is my understanding* that two of the claims alleged in Nubenco's complaint ... are not actionable in a civil proceeding in Nicaragua but, rather, are only actionable as criminal charges." *Id.*, ¶ 15 (emphasis added). This statement appears to fall short of what constitutes "personal knowledge" as required by Local Rule 27A.

Assuming *arguendo* the claims of defamation and misappropriation asserted by Nubenco are only viable as criminal causes of action in Nicaragua, that is not a basis to preclude application of the entire controversy doctrine in these circumstances. If the 1995 New Jersey Action is permitted to proceed, and the governing law clause of the August Agreement is given effect as to Nubenco's breach of contract claims under that agreement, it is not certain that New Jersey law would govern the remaining tort law claims.

Because the tort claims that Nubenco alleges in the 1995 New Jersey Complaint arose in Nicaragua, *see* 1995 New Jersey Complaint,[28] it would appear Nicaraguan law would apply. *Cf. Gantes*, 145 N.J. at 484, 679 A.2d 106; *Westinghouse Elec. Corp.*, 774 F.Supp. at 1449. The governing law clause of the August Agreement explicitly states that, *"This agreement* is to be governed by the laws of the State of New Jersey." *See* August Agreement at 2 (emphasis added). The provision is silent, however, as to what law applies to disputes arising outside of the August Agreement. The April Agreement contains no governing law clause.

As stated, the tort claims alleged by Nubenco do not specifically appear to arise out of either the August Agreement or the April Agreement, but rather out of extra-contractual events. *See* 1995 New Jersey Complaint. The choice of law provision in the August Agreement, then, would not apply to those claims. *See, e.g., Thompson and Wallace of Memphis, Inc. v. Falconwood Corp.*, 100 F.3d 429 (5th Cir.1996) ("tort causes of action are separate from the agreement and its enforcement, and thus the choice-of-law provision does not govern them."); *Anglo American Ins. Group, P.L.C. v. CalFed Inc.*, 940 F.Supp. 554, 558 (S.D.N.Y.1996) (under applicable "conflict of law rules, a contractual choice of law provision 'does not bind [the parties] as to causes of action sounding in tort.'"); *Shelley v. Trafalgar House Public Ltd. Co.*, 918 F.Supp. 515, 521–22 (D.Puerto Rico 1996) ("contractual choice of law clauses do not encompass tort causes of action"); *Jiffy Lube International v. Jiffy Lube*, 848 F.Supp. 569, 576 (E.D.Pa.1994) (contractual choice of law provisions "do not govern tort claims between contracting parties unless the fair import of the provisions embraces all aspects of the legal relationship"); *Grossman v. Club Med Sales, Inc.*, 273 N.J.Super. 42, 51, 640 A.2d 1194 (App.Div.1994) (recognizing "that the law of one jurisdiction may apply to one issue in a matter and the law of a second jurisdiction to another."); *Sutter Home Win-*

---

**27.** As will be discussed, however, the relevant provision states: *"This agreement* is governed by the laws of the State of New Jersey." *See* August Agreement at 2 (emphasis added). The governing law clause does not appear to encompass the extra-contractual torts of defamation and misappropriation of trade secrets, which, upon a balancing of interests, would be governed by the law of the forum where the act was committed.

**28.** The 1995 New Jersey Complaint does not specifically indicate that the alleged tortious conduct of the Defendants occurred in Nicaragua.

The submissions of both parties indicate, however, that the relationship was born of the agreements which encompassed activities that occurred in Nicaragua. It follows that "all of the conduct which Nubenco complained of occurred in Nicaragua." *See* Reply Brief at 1 & n. 2.

Nubenco has not suggested otherwise. Nubenco has not argued that the tortious conduct occurred outside of Nicaragua or in New Jersey, making New Jersey the appropriate venue for its action, independent of the August Agreement governing law clause.

*ery, Inc. v. Vintage Selections, Ltd.*, 971 F.2d 401, 407 (9th Cir.1992) ("claims arising in tort are not ordinarily controlled by a contractual choice of law provision") (citations omitted). *See also Consolidated Data Terminals v. Applied Digital Data Systems*, 708 F.2d 385, 390 n. 3 (9th Cir.1983) ("other issues in this case, which involve tort law and the law of punitive damages, are not controlled by the contract choice of law provision"); *Computerized Radiological Services, Inc. v. Syntex Corporation*, 595 F.Supp. 1495, 1503 (E.D.N.Y.1984) ("although the contract claim is governed by California law (by choice of the parties), a tort claim arising out of the contract may be governed by the law of a different forum."), *rev'd in part on other grounds*, 786 F.2d 72 (2d Cir.1986).

The Defendant corporations in this matter were formed under the laws of Nicaragua. Defendant Lacayo, is a citizen of Nicaragua. The relationship of the parties was centered in Nicaragua; the April Agreement and August Agreement encompassed activities which were to take place in Nicaragua. Finally, the tortious actions alleged in the 1995 New Jersey Complaint occurred in Nicaragua. It appears Nicaragua would have the greater governmental interest, for the purposes of choice of law analysis, of those claims.[29] Although New Jersey may have a legitimate interest in awarding compensation for tortious acts against its domestic corporations, Nicaragua has a greater interest in applying Nicaraguan law against Nicaraguan domiciliaries for actions that occurred in Nicaragua. It is not clear how New Jersey tort law would apply when Nicaragua has the greater interest. *See Almog*, 298 N.J.Super. at 158–59, 689 A.2d 158 (where key events occurred in New Jersey, underlying contracts and agreements were made in New Jersey, egregious conduct was committed in New Jersey and in Israel by New Jersey residents and more complete remedy was available to victims in New Jersey, there was "no doubt in light of the totality of the circumstances that New Jersey's interest in the controversy as a whole [was] paramount to Israel's").

Nubenco asserts some of its tort claims cannot be litigated civilly, but only criminally, in Nicaragua. Nubenco now wants to bring the claims in New Jersey, under New Jersey law, based on a governing law clause in the August Agreement. As discussed, it is unclear how Nubenco can assert a cause of action under New Jersey law if the alleged acts occurred in Nicaragua, not New Jersey.

By barring Nubenco from pursuing its claims in Nicaragua, however, the Nicaraguan courts are not treating Nubenco differently from other Nicaraguan litigants. Rather, based upon the assertions of Nubenco it appears that, under Nicaraguan law, no party in Nicaragua is permitted to pursue such claims civilly. If conduct that occurred in Nicaragua is not a tort in Nicaragua, the conduct is not recoverable in New Jersey under New Jersey law simply because the action was brought here. Accordingly, Nubenco's argument that it will be unable to pursue its claims civilly in Nicaragua is not a basis under these circumstances to bar application of the entire controversy doctrine.

### 6. *Claims Against Lacayo*

▮▮▮▮ Nubenco further contends the entire controversy doctrine should not apply because Nubenco cannot prosecute its claims against Lacayo personally in the 1994 Nicaraguan Action because Lacayo is not a party to that suit.[30] Benzaken Certification, ¶ 25. The entire controversy doctrine bars suits

---

**29.** Neither party addressed the issue of what law would govern if the action were to continue in New Jersey. Even giving Nubenco the benefit of all inferences, and assuming the August Agreement and its governing law provision also encompassed the tort law claims in the 1995 New Jersey Complaint, then it should also apply to any timely action or counterclaim asserted in Nicaragua. In other words, if the governing law clause of the August Agreement applies to the tort law claims in New Jersey, it should also apply in Nicaragua. Nothing in the record suggests the Nicaraguan courts would not honor a contractual choice of law provision.

**30.** In a footnote in the reply brief, it appears the Defendants raise the issue of whether personal jurisdiction is proper over Lacayo. Defendants' Reply, 1 & n. 1. Defendants also question whether Lacayo had been successfully served with the Summons and Complaint in the 1995 New Jersey Action. Because Nubenco did not have the opportunity to respond to this argument, its merits are not addressed.

against parties that could have been joined in the earlier litigation. *See, e.g., Cogdell,* 116 N.J. at 26, 560 A.2d 1169; *Crispin,* 96 N.J. at 343, 476 A.2d 250 (recognizing that joinder of known parties in a single pending action should be the norm). Nubenco has not demonstrated Lacayo could not have been joined in the 1994 Nicaraguan Action had Nubenco had acted timely and pursued its counterclaims in that forum.

### 7. Analysis of Threefold Purpose

As discussed, the entire controversy doctrine applies to constituent claims that arise during the pendency of the first action that were known to the litigant. *DiTrolio,* 142 N.J. at 274–75, 662 A.2d 494. In determining whether successive claims constitute one controversy for the purposes of the doctrine, the central consideration is whether the claims arise from related facts or the same transaction or series of transactions. *Id.* at 267, 662 A.2d 494. "It is the core set of facts that provides the link between distinct claims against the same or different parties and triggers the requirement that they be determined in one proceeding." *Id.* at 267–68, 662 A.2d 494.

The entire controversy doctrine incorporates all affirmative claims that a party might have against another party, *including* counterclaims and cross-claims. *Circle Chevrolet,* 142 N.J. at 289, 662 A.2d 509 (citing *Ajamian,* 14 N.J. at 487–89, 103 A.2d 9). When a party chooses to fragment litigation by suing certain parties in another jurisdiction and withholds claims against other parties, a New Jersey Court need not later entertain the omitted claims if jurisdiction was available in the first forum. *Mortgagelinq Corp.,* 142 N.J. at 338, 662 A.2d 536.

In the instant matter, Nubenco had the opportunity to pursue its claims in Nicaragua

and attempted to do so, but was precluded because of procedural matters.[31] Benzaken Certification, ¶ 24. After Nubenco discovered that because of its conduct it could not pursue its claims in Nicaragua, and after failing to pursue the 1994 New Jersey Action, it began the proceedings in 1995 New Jersey Action. Nubenco may not now have a second bite at the apple. *See Bernardsville Quarry,* 929 F.2d 927 at 930. Applying the entire controversy doctrine here does not offend the threefold purpose behind the doctrine.

The entire controversy doctrine seeks to avoid piecemeal litigation. It is the core set of facts that provides the link between distinct claims against the same or different parties and triggers the requirement that they be determined in one proceeding. *See DiTrolio,* 142 N.J. at 267, 662 A.2d 494. Here, the 1994 Nicaraguan Action and 1995 New Jersey Action share the same core set of facts, which arise from the April Agreement, the August Agreement and the extracontractual events surrounding the agreements. Although the parties may assert distinct legal claims, "the unwavering requirement [of the entire controversy doctrine is] that all claims and all parties be joined a single suit." *Hulmes,* 924 F.Supp. at 679 (citations omitted)

As discussed, the entire controversy doctrine is fundamentally predicated upon "judicial fairness and will be invoked in that spirit." *See Crispin,* 96 N.J. at 343, 476 A.2d 250. The key consideration is whether the "party whose claim is being sought to be barred ... had a fair and reasonable opportunity to have fully litigated that claim in the original action." *Esoldi,* 930 F.Supp. at 1027 (quoting *DiTrolio,* 142 N.J. at 273, 662 A.2d 494). Consideration is also given as to

---

**31.** At the time this motion was filed, the question of whether Nubenco would be allowed to file its answer to the Defendants' Complaint was pending before the Nicaraguan courts. Benzaken Certification, ¶¶ 23–24. As stated, later correspondence indicates that the contempt of court imposed on Nubenco was reversed, vacating the default. While Nubenco was able to file an answer, it was still unable to file a counterclaim. *See* Letter, dated 14 March 1996, from Counsel for Nubenco. The Nicaragua Court then dis-

missed the claims in the 1994 Nicaragua Action against Nubenco. *See* Letter, dated 9 August 1996, from Counsel for Nubenco. The embargo against Nubenco has also been lifted and "the entire case is still under appeal by [Nubenco's] adversary." *See* 3 December 1996 Nubenco. It is unclear whether the appeal encompasses only the dismissal of the 1994 Nicaraguan Action, or also the inability of Nubenco to file a counterclaim.

whether it is fair to preclude the second action because the entire controversy doctrine was not followed. *Id.* Finally, it must be determined whether the failure to follow the entire controversy doctrine is attributable to excusable neglect. *Id.*

These factors do not weigh against applying the entire controversy doctrine in this matter. Nubenco filed concomitant actions via the 1994 Nubenco Nicaraguan Counterclaim and the 1994 New Jersey Complaint. It chose not to pursue the 1994 New Jersey Action, which was dismissed for lack of prosecution. Procedural errors committed by Nubenco prevented it from litigating its claims in the 1994 Nicaraguan Action. In response, Nubenco brought the 1995 New Jersey Action. Nubenco has proffered no facts to demonstrate the inability to present its claims in the 1994 Nicaraguan Action was not self-inflicted or not avoidable.

Nubenco alleges that, even if the entire controversy doctrine does apply, it should be excused from its application because "Nubenco's Nicaraguan counsel could not have known or even reasonably anticipated that he would have to act consistently with New Jersey Court Rules to preserve Nubenco's rights under the contract at issue here (which, according to the [D]efendants, is *not* at issue in the Nicaragua court)." Nubenco Brief in Opposition, 21 (citing *Mortgagelinq,* 142 N.J. at 345, 662 A.2d 536 ("New Jersey should not seek to export its entire controversy doctrine to regulate conduct of attorneys" in a foreign jurisdiction)). Nubenco attributes its failure to anticipate the expansion of the entire controversy doctrine in this case to excusable neglect. Nubenco Brief in Opposition, 22.

The record demonstrates, however, that Nubenco was represented by counsel at all times in the 1994 Nicaraguan Action, the 1994 New Jersey Action and the 1995 New Jersey Action. Accordingly, this is not a situation where there is a concern of exporting the entire controversy doctrine to regulate attorneys in foreign jurisdictions. *See Mortgagelinq,* 142 N.J. at 345, 662 A.2d 536.

Contrary to Nubenco's assertions, it is not "patently unfair" to bar Nubenco from bringing its claims in the 1995 New Jersey Action.

*Id.* at 22. Nubenco is a New Jersey corporation that was aware it might want to litigate in the New Jersey courts. Nubenco, however, chose to participate in the 1994 Nicaraguan Action when it filed not only an answer, but a counterclaim as well. It had the opportunity to litigate its claims in the 1994 Nicaraguan Action, but was barred due to its own procedural error. Nubenco cannot now assert unfairness when the opportunity to litigate was available, but Nubenco failed to conform to Nicaraguan procedural requirements.

In addition, although the Defendants do not argue the existence of prejudice if they are subject to litigation in New Jersey, burdens upon the Defendants do exist. The Defendants would be forced to litigate, in two countries, lawsuits that are derived from essentially the same core set of facts. Defendants would be forced to expend time and resources defending claims which were effectively barred in the 1994 Nicaraguan Action due to the apparent fault of the Nubenco. Defendants are prejudiced if they could have defended against Nubenco's claims in a single, more convenient forum in Nicaragua.

The third purpose of the entire controversy doctrine is to further promote judicial economy and efficiency. *DiTrolio,* 142 N.J. at 277, 662 A.2d 494. Nubenco contends the promotion of judicial economy and efficiency is "greatly reduced in importance where, as here, the initial case is still in the very initial period following the filing of the complaint." Nubenco Brief in Opposition, 19 (citations omitted).

"Many cases support the conclusion that the entire controversy doctrine will bar a second suit when the prior suit has reached the merits of some, but less than all, of the plaintiff's claims, or when the prior suit has been prosecuted against some, but less than all, of the possible defendants." *Hulmes,* 924 F.Supp. at 683 (citing *Circle Chevrolet,* 142 N.J. at 280, 662 A.2d 509; *DiTrolio,* 142 N.J. at 253, 662 A.2d 494). Here, judicial economy is achieved by dismissing a case that could have, and should have, been prosecuted diligently in an earlier action.

A review of the pleadings in the 1994 Nicaraguan Action, the 1994 New Jersey Action and the 1995 New Jersey Action demonstrate that, although the claims asserted by Nubenco and the claims asserted by the Defendants are not identical, they do arise from the same core set of facts.

The 1994 Nicaraguan Complaint alleged that, pursuant to the April Agreement, Nubenco, Inversiones and Tecnologia "were committed that neither one would intent to circumvallate (sic) in any way shape or form, among themselves or with anybody else." *See* 1994 Nicaraguan Complaint, 2 (Defendants' Translation). The 1994 Nicaraguan Complaint alleged: "Nubenco ... proceeded to circumvallate (sic) the representation granted to [the Defendants by] dealing with [the Ministry of Health], through other agents and representatives ... [and thereby] avoided the ten percent (10%) and fifteen [percent] (15%) commission ... according to the [April Agreement]." *Id.* The 1994 Nicaraguan Complaint sought compensation for loss of profit as well as "damages and injuries ... [of] two hundred, seventy five thousand dollars or its equivalent in cordobas...." *Id.* at 3.

Similarly, the 1995 New Jersey Complaint alleged, in part, "[Inversiones] and [Tecnologia] have ... breached the contracts by circumventing their obligations to Nubenco and, after [their] rights pursuant to the [April Agreement and August Agreement] had ended, directly contacting two different suppliers of materials to Nubenco in direct violation of their obligations to Nubenco." *See* 1995 New Jersey Complaint, ¶ 4. The 1995 New Jersey Complaint seeks "compensatory damages, costs, interests [and] attorneys fees." *Id.* at 3. Accordingly, while the 1994 Nicaraguan Complaint alleges breach of the April Agreement and the 1995 New Jersey Complaint alleges breach of both the April Agreement and the August Agreement, the claims essentially arise from the same set of facts.

As stated, in addition to the 1994 New Jersey Complaint and 1995 New Jersey Complaint, Nubenco also filed the 1994 Nubenco Nicaraguan Answer and 1994 Nubenco Nicaraguan Counterclaim. *See* 1994 Nubenco Nicaraguan Answer and 1994 Nubenco

Nicaraguan Counterclaim. The 1994 Nubenco Nicaraguan Answer essentially denied the allegations in the 1994 Nicaraguan Complaint. See 1994 Nubenco Nicaraguan Answer, 10–15 (Defendants' Translation), 19–30 (Nubenco's Translation).

The 1994 Nubenco Nicaraguan Counterclaim, however, asserted affirmative claims of "[f]raud, [n]egligence or [b]ad [f]aith" and requested the court to "condemn [Inversiones and Tecnologias] fraudulent actions and to charge them with responsibility to pay all legal costs as well as all other damages caused by their negligence." *Id.,* 15 (Defendants' Translation), *see also* 1994 Nubenco Nicaraguan Counterclaim, 30 (Nubenco's Translation).

Although couched in different terms, many of the claims alleged in the 1994 New Jersey Complaint and the 1995 New Jersey Complaint are similar to the claims alleged in the 1994 Nubenco Nicaraguan Counterclaim. The 1994 Nubenco Nicaraguan Counterclaim alleged bad faith on the part of Inversiones and Tecnologia due to their attempt to invoke "a contract wherein they attempt[ed] to [enforce] parts not agreed to by the parties ... coerce a payment for what is not owed by threatening to ban marketing of [Nubenco's] products in Nicaragua ... [and] carrying out transactions in administrative matters unsuccessfully and ... before the court." *See* 1994 Nubenco Nicaraguan Counterclaim, 15 (Defendants' Translation); *see also* 1994 Nubenco Nicaraguan Counterclaim, 30 (Nubenco's Translation). These allegations are not dissimilar to the second and third counts of the 1995 New Jersey Complaint which allege tortious interference with Nubenco's contractual relations with third parties and abuse of process for improperly instituting legal proceedings. *See* 1995 New Jersey Complaint, counts two and three.

Even based upon a cursory comparison, it is clear the 1994 Nicaraguan Action and the 1995 New Jersey Action (as well as the 1994 New Jersey Action) arise from the same core set of facts. In addition, the spirit of the issues raised by Nubenco appear to be largely similar, though labeled differently in the various pleadings. It would be a waste of judicial resources to permit the 1995 New

Jersey Action to continue when the opportunity to litigate in the 1994 Nicaraguan Action was available to Nubenco. Judicial economy is achieved by dismissing the claims that could have, and should have, been litigated in the earlier action.[32] Accordingly, application of the entire controversy doctrine in this matter does not offend the threefold purpose behind the doctrine. The Defendants' Motion for Summary Judgment is granted.

### Conclusion

For the reasons set forth above, the Defendants' Motion for Summary Judgment is granted.

---

**32.** Even if the determination here were that the entire controversy doctrine did not act as a bar, a stay of the proceedings would be imposed until the conclusion of the 1994 Nicaraguan Action and appeal. *See Kaselaan & D'Angelo Associates, Inc. v. Soffian,* 290 N.J.Super. 293, 299, 675 A.2d 705 (App.Div.1996) ("Although multiple pending actions arising out of the same or related operative facts pose some of the same dangers of fragmented and duplicative litigation that the entire controversy doctrine seeks to address, those dangers do not require the dismissal of the second filed action prior to the conclusion of the first action.").

Under the facts of this case, however, a stay of the proceedings, rather than dismissal, would be pointless. It would result only in the postponement of the inevitable as the Defendants would simply raise the entire controversy defense again once the stay had been lifted.